**Boyce A. BUSH et al.**

v.

**LONE STAR STEEL COMPANY et al.**

**Civ. A. No. 1420.**

United States District Court,
E. D. Texas,
Marshall Division.

Jan. 16, 1974.

Gabrielle K. McDonald, Houston, Tex., for plaintiffs.

Robert Burns, Dallas, Tex., for Lone Star Steel Co.

Chris Dixie, Houston, Tex., for United Steel Workers of America, AFL–CIO.

## MEMORANDUM OPINION AND ORDER

JUSTICE, District Judge.

The plaintiffs in this civil action allege racial discrimination in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. (hereinafter "Title VII" or "the Act").[1] Plaintiffs, who represent a designated class of black persons employed, or formerly employed, by defendant Lone Star Steel Company (hereinafter "the company" or "Lone Star"), are either members of, or are employed in the bargaining unit represented by, defendant Local 4134, United Steel Workers of America, AFL–CIO (hereinafter "the local union"). The United Steel Workers of America, AFL–CIO (hereinafter "the international union"), was joined as an additional defendant shortly after this civil action was filed.

Lone Star was organized in 1942 to operate the current plant for the Defense Plant Corporation during World War II. After the war, Lone Star purchased the plant from the War Assets Corporation. Originally developed as a merchant pig mill, the plant primarily consisted of ore mines, an ore plant, and a blast furnace.

During its years of operation as a pig iron plant, Lone Star did not segregate its lines of progression[2] on the basis of race. The ore mines and the ore plant, for example, did not have, and have never had, racially segregated lines of progression. Most of the employees performed heavy, "pick and shovel" labor; only a few were engaged in the more skilled positions in the blast furnace and coke ovens or the utilities department.

In the 1950's, Lone Star began expansion. The cast iron pipe foundry was added in 1950 to enlarge the product mix; in 1953, the steel division was included. With the formation of the steel division, Lone Star decided to recruit employees with prior experience in rolling mills, pipe mills, and open hearth operations. Since no steel operations were available in northeast Texas, the company turned to the mills of Alabama and the states in the East. Within the newly organized steel division, the higher skilled jobs, such as the first helper, second helper, and first ladleman, and the top crane jobs, were given to these workers from Alabama and the East. The lower skilled jobs, such as the hookers, the spout men, and the other laborers, were filled by the local people, most of whom were black. The institution of segregated lines of progression in the steel division, as well as some other departments in the pig iron division, was the result of the recommendation of top supervision from other steel mills and the influence of local custom in East Texas. The wage and working conditions in the steel mill, however, were superior to those of other industry in East Texas during this period.

---

1. The Title VII statement of jurisdiction is found in 42 U.S.C.A. § 2000e–5(f). Plaintiffs have an alternative basis for jurisdiction under the Civil Rights Act of 1866, 42 U.S.C.A. § 1981; 28 U.S.C.A. § 1343. Caldwell v. National Brewing Company, 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971).

2. Some of the terminology requires explanation. "Lines of progression" refer to the hierarchy of jobs, arranged on a vertical ladder by job classification, through which the employee moves in promotion or demotion within a particular department. A "sequence" consists of one or more lines of progression. "Pool jobs" are those jobs at the lowest level, just below the first rung of the line of progression; this first rung is the "entry level job."

Today, Lone Star continues its combined pig iron and steel production, described as an integrated process. The company mines the ore and then processes it through the blast furnace and the open hearth, where it is refined and made into steel. From the open hearth, the steel moves to various finishing facilities, including rolling mills and pipe mills. The primary products from these mills are tubular goods. Lone Star also has a cast iron pipe foundry, making pipes for sewer and other water facilities, and allied coke ovens and various service units.

Plaintiffs have exhausted their administrative remedies with the Equal Employment Opportunity Commission (EEOC). In a decision rendered on April 22, 1971, the EEOC determined that the company and the local union maintain a racially discriminatory transfer, promotion, and seniority system as well as racially segregated facilities. In the instant action, plaintiffs seek injunctive and declaratory relief to enable both themselves and the class they represent to reach their rightful place in employment. Additionally, plaintiffs seek back pay, costs, and attorneys' fees.

## DEFINITION OF CLASS

Plaintiffs represent a class consisting of all black persons, whether currently employed or retired, who were employees of the company on or after July 2, 1965,[3] and who were either (1) hired before the date of the merger of the pool jobs under the segregated lines of progression or (2) hired on or after the date of the merger of the pool jobs under the segregated lines of progression but who nevertheless occupied permanent jobs in an all-black line of progression.[4] *See* Rule 23(b)(2), Fed.R.Civ.P.

■ Defendants argue that the class should be narrowed to exclude those black employees hired on or after the date of the merger of the pool jobs on the ground that those blacks were free to enter the all-white lines. The argument is not convincing. As hereafter shown, black employees were "free" to enter the all-white lines only to the extent that they were willing to forego the benefit, even though minimal, of an available promotion through the all-black lines from the pool jobs in order to wait for the opportunity to move up through the more desirable and lucrative jobs in the all-white lines. Further, even after merger of the pool jobs, a greater percentage of blacks than whites continued to move through the all-black lines.[5] Finally, the "freedom to transfer" from all-black to all-white lines remains meaningless in light of the resulting loss of seniority and cut in pay. *Cf.* United States v. Hayes International Corporation, 415 F.2d 1038 (5th Cir. 1969).

## PLAINTIFFS' ALLEGATIONS

Plaintiffs allege that the defendants have maintained the following policies and practices in denying blacks equal employment opportunities and conditions of employment:

I. Racially segregated lines of progression resulting in lower paying, less desirable jobs, and a greater chance of lay-off in the following departments: (1) Blast Furnace; (2) Cast Iron Pipe Foundry; (3) Coke Ovens and Coal Chemicals; (4) Open Hearth; (5) Electric Weld Pipe Mills—Finishing; (6) Transportation; (7) Shipping; and (8) Masonry;

II. A racially discriminatory transfer, promotion, and seniority system in the above-named departments, established by the defendants through labor-management agreements;

III. Racially segregated facilities— for example, rest rooms, cafeterias, change houses, and water fountains;

IV. Exclusion of blacks from certain all-white departments;

---

3. This is the applicable effective date. *See* 42 U.S.C.A. § 2000e(b) and the accompanying note on the effective date.

4. The precise definition of the class will vary from one department to another. See Section VIII, Relief.

5. *E. g.*, Plaintiffs' Exhibits 50, 70.

V. Denial to blacks of equal opportunity for selection as supervisory personnel; and

VI. Racially discriminatory representation by the local and the international union.

### I. Racially Segregated Lines of Progression

■ As their first contention, plaintiffs allege that the company has maintained racially segregated lines of progression in the eight departments mentioned above. The company admits that racially segregated lines were maintained *before* July 2, 1965, in all of these departments except Transportation.[6] The company further admits that racially segregated lines were maintained for several years after July 2, 1965, in all of the eight departments except Transportation and Masonry[7] but claims that certain steps were taken to eliminate the segregation. (The adequacy of these steps is discussed in the next section.) Considering these admissions, it is apparent that, by the maintenance of racially segregated lines of progression, the Act was violated in at least six of the above-named departments after July 2, 1965.

■ The evidence established, moreover, that the defendants made a practice of replacing blacks with whites in the black lines of progression; transferring jobs in black lines, as they became automated, to the white lines; and abolishing certain jobs in the black lines and transferring the responsibilities of those jobs to jobs in the white lines. This practice—the subjection of black employees to a greater percentage of layoffs than whites solely on the basis of race—constitutes a further violation of the Act.

### II. Racially Discriminatory Transfer, Promotion, and Seniority System

#### A. Background

Although defendants assert that certain steps taken after July 2, 1965—essentially the merger of pool jobs below certain lines of progression—were sufficient to eliminate line segregation and the residual discriminatory effects, plaintiffs contend that the transfer, promotion, and seniority system embodied in the labor agreements and local working conditions have perpetuated the racial discrimination. Specifically, plaintiffs argue that the system continues to discriminate against class members for the following reasons: (1) a transfer from one line of progression to another results in a cut in pay in most instances; (2) the right to transfer lies within the discretion of the company; and (3) if they choose to transfer, blacks are required to start at the *entry* level jobs in the formerly all-white line of progression and to progress within the line on the basis of *line* seniority (which blacks, because of their race, were denied an equal opportunity to accrue).

On November 23, 1971, the court commenced a hearing in this matter that produced seven days of testimony. The evidence disclosed that the following jobs or lines of progression, listed by department, were composed entirely of black employees as of July 2, 1965: (1) Blast Furnace—the Furnace and Pig Machine Lines; (2) Cast Iron Pipe Foundry—the Troughman Line; (3) Coke Ovens and Coal Chemicals—the Larry Car Operator Line; (4) Electric Weld Pipe Division, Finishing—the EW-G Lines (Forklift Job); (5) Open Hearth—the Pit Hooker, Mold Yard Hooker, Stocker, and Open Hearth Laborer Jobs; (6) Shipping—the Bundling Machine, Material Handling, and General Laborer Jobs; (7) Transportation—the Track Walker, Track Laborer and Yard Laborer Jobs; and (8) Masonry—the Tractor Operator Lines.

At the conclusion of this hearing on December 3, 1971, the court issued an order from the bench that reads in pertinent part as follows:

> Under Title VII of the Civil Rights Act of 1964 the appellate courts have

---

6. Final Pre-Trial Order.

7. Defendant Company's Answer to Plaintiffs' Interrogatory No. 12.

held that the effects of . . . previous discrimination must be eliminated in certain specific ways. This court is obligated to follow and apply the law and will therefore enter appropriate injunction orders, which will include the following principles as directed by the higher courts:

(1) In those departments where blacks have previously been excluded from lines of progression in their department the lines shall be merged with formerly white lines of progression.

(2) Black employees previously so excluded shall be permitted to utilize their departmental seniority to promote to temporary and permanent vacancies which occur in their departments and in case of a reduction in force, provided they have the ability and physical fitness required.

(3) Black employees who were formerly restricted to a line of progression, and who subsequently transferred to another line of progression within their department, and who were required to give up their seniority in their line, shall be credited with their department seniority, which shall be used for promotion and reduction in forces.

(4) Neither occupants of formerly black lines nor occupants of formerly white lines shall be accorded preferred seniority rights.

(5) Other remedial measures should be adopted to provide equal opportunity.

The parties have submitted certain proposals for the revision and reorganization of the existing lines of progression in certain cases. The Court hereby severs the question of revision of such lines for later hearing as a part of the determination of the final remedy.

With these guidelines given by the court to the parties, the parties are hereby directed to confer to agree, if they can do so, upon the details of a final injunction order to be submitted for the court's approval. The parties are directed to report to the court on or before January 3, 1972.

Since the parties were unable to agree on all aspects of a final order, a second hearing was held on July 12, 1972, to consider the manner in which members of the affected class would move up the lines of progression after installation of the revised lines of progression. Before resolving disputes regarding progression within the individual departments, the court turns to a discussion of the applicable law.

### B. *Applicable Law*

A transfer, promotion, and seniority system that has the effect of perpetuating racially discriminatory employment practices is unlawful unless the system can be justified by a clear showing that business necessity compels its continued use. Beginning with Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), the first definitive appellate decision on discriminatory seniority systems under Title VII of the Act, the Fifth Circuit has consistently struck down seniority systems which perpetuate racially discriminatory employment practices without business justification. *E. g.,* United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972); United States v. Jacksonville Terminal Company, 451 F.2d 418 (5th Cir. 1971) cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Long v. Georgia Craft, 450 F.2d 557 (5th Cir. 1971); Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971).

A business necessity that will justify a continuation of a racially discriminatory transfer, promotion, and seniority system is one that is "essential" and "required" for the safe and efficient operation of the business. Local 189, United Papermakers & Paperworkers v. United States, *supra*; United States v. Jacksonville Terminal Company, *supra*. Neither the expense involved

in changing from a discriminatory system nor the conformance with industry practice constitutes a business necessity that would justify the continuation of racial discrimination. Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971), petition for cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1972). The burden rests with the defendants to justify the use of a device which has the effect of disparate treatment against blacks. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

C. *Department Seniority as the Basis for Promotion and "Skipping" of Intermediate Jobs*

Although defendants have agreed to modification of some of the lines of progression to permit department seniority to govern the move from a pool job to an entry level job in a given sequence, they insist that the use of department seniority as the basis for promotion throughout the lines following merger, with concomitant skipping of intermediate jobs, would cause "inversion of the labor force." The evidence does not support this contention.

First, the number of black employees with sufficient seniority to necessitate the skipping of intermediate jobs is comparatively small. Secondly, the current labor-management agreements provide that promotions are to be made on the basis of seniority, ability, and physical fitness, and further provide that only if ability and physical fitness are relatively equal does seniority govern. Thus there is no absolute right on the part of either a black or white employee to secure a permanent opening or a temporary vacancy strictly on the basis of seniority; the employee promoted must be *qualified.*

Thirdly, any necessity for general familiarity with the jobs in the lower end of the lines of progression as a prerequisite for promotion to higher jobs has been substantially satisfied. The similarity of job descriptions cuts across black and white lines of progression. Working side-by-side within the same departments, black and white employees have gained familiarity with many similar jobs in both black and white lines. Black employees permanently assigned to the black lines of progression often trained white employees to perform similar jobs in the white lines. Moreover, some blacks have worked on a temporary basis for long periods of time in the white lines without previously working the next lower job. Additionally, the system of waivers currently in effect permits employees to skip several jobs to fill higher rated jobs on an on-the-job training basis. Furthermore, some jobs in black lines were automated, paid at a higher rate, and then placed in the white line.

Finally, only a few vertical relationships among the jobs within a specific line of progression are such as to require an employee to work certain specific intermediate jobs prior to promotion to his new job. Those few are established by the evidence or by agreement of the parties in the plans proposed to the court and rule out the skipping of certain jobs. Thus the jobs of First Helper, Charging Car Operator, Ladle Craneman, Hot Metal Craneman, and the First, Second, and Third Ladleman in the Open Hearth Department should not be available to an employee who has not worked the job immediately below each of these jobs. For promotions not controlled by one of these exceptions, however, the company may still require a reasonable trial, or break-in, period to determine whether the employee claiming the job on the basis of department seniority is qualified on the basis of ability and physical fitness to to perform the work.

Defendants have not established a business necessity for making promotions on the basis of line seniority. In order for plaintiffs to achieve their rightful place in the lines of progression, department seniority (with accompanying skipping of intermediate jobs where specified in the relief section of this order) should

govern all promotions and demotions, when both members and non-members of the affected class are bidding for the same jobs. *Cf.* Long v. Georgia Kraft Company, 450 F.2d 557 (5th Cir. 1971) (reversing the district court and remanding for further consideration of the extent to which business necessity would permit advance level entry and job skipping).[8]

■ Seniority rights have their basis in labor agreements negotiated between companies and labor unions. These rights are not different from other contract rights; that is, they are subject to change and must comport with law. No employee, whether black or white, has the right to the continuation of an illegal system simply because the system is founded in a labor agreement. Courts have consistently recognized that expectations of white employees may be frustrated when changes are made to end a discriminatory seniority system and black expectations are raised to the level of those of whites. *E. g.*, United States v. Bethlehem Steel Corporation, 446 F.2d 652 (2d Cir. 1971); Robinson v. Lorillard Corp., 319 F.Supp. 835 (M.D.N.C.1970).

### D. *Definition of Permanent Openings and Temporary Vacancies*

■ The second area of major disagreement concerns the definition of permanent openings and temporary vacancies for purposes of promotion. Defendants cite the "inversion of the labor force" argument and contend that, where applicable, the definition of an increase of forces giving rise to a permanent opening contained in the labor-management agreements currently in effect should be substantially modified, after the merger of the lines of progression. Those agreements are Local Working Condition No. 14, effective February 29, 1968, and Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL–CIO, dated October 16, 1971. Specifically, defendants contend that an increase in forces in the Blast Furnace and Cast Iron Pipe Foundry should last more than 30 days; in the Shipping and Open Hearth, Transportation, and Electric Weld Pipe—Finishing, more than 60 days; and in the Masonry and Coke Plant, that no period of time should be required.

Under the defendants' proposal, the evidence establishes that, with the exception of the Electric Weld Pipe Department—Finishing Mill (which has recurrent changes in the level of the work force), the departments could not reasonably expect to see an increase in the level of the work force lasting a sufficient period of time to give rise to a permanent opening. Changing the "rules of the game" at this stage would nearly guarantee that blacks, following merger of the lines, would be frozen in their slots for such long periods of time as to obliterate, for all practical purposes, the advancement of blacks to their "rightful place." Except for conclusory statements, defendants have come forward with no persuasive evidence as to why such changes in the labor-management agreements—not required on the basis of business necessity before the date of this order—are required after the date of this order.

---

8. In a note relied on extensively by the Fifth Circuit in its decision in Local 189, United Papermakers & Paperworkers v. United States, *supra*, the authors comment that

> To the extent [a rule requiring job-by-job progression] has a basis in job qualification, so that skills acquired in the earlier jobs are needed for the higher level positions, the courts would have to defer to it in fashioning a remedial order, unless [individual] Negroes can show that they have in fact filled higher-level jobs satisfactorily. On the other hand, where the line of progression technique had been adopted simply to channel and rationalize job movements in a department, other techniques for demonstrating qualification such as testing or the use of "probation periods" could be utilized and the "rightful place" approach applied.

Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1279 (1967).

Recently, the Fifth Circuit rejected a similar argument advanced by the defendants in United States v. Hayes International Corporation, *supra* at 116–119 of 456 F.2d. The dispute in *Hayes* involved remanning and recall rights, which entitled an employee laid off or remanned from his job to return to that same job ahead of another employee—who was also qualified but more senior—simply on the basis that the former employee held the job once before. Defendants contended that disturbing these rights would permit an influx of new employees at the top—a variation of the "inversion of the labor force" argument advanced by defendants in this case.

> These rights appear to be neutral on their face, but have the effect of allowing a residuary disadvantage to those senior negro [sic] employees transferred to lower classifications who are also qualified to perform the higher jobs in that line of progression.
>
> Qualified negroes [sic] with greater seniority can not displace incumbent workers. However, they are to be given a preference for future vacant jobs absent a compelling business reason. . . . [The employer] attempts to justify these rights because it is necessary in times of rapid employee expansion to have experienced men rather than newcomers in the higher classified positions. While this may be considered a nonracial business purpose, we do not find it to be sufficiently overriding and compelling to outweigh the discriminatory effect it might have upon the negro [sic] transferee. . . . Furthermore the only person who would be preferred ahead of a junior experienced employee would be a senior qualified negro [sic] transferee. This would not endanger the safe and efficient operation of the plant.

United States v. Hayes International Corporation, *supra,* at 118 [citations omitted].

### III. *Racially Segregated Facilities*

Before July 2, 1965, the defendant company maintained some facilities segregated by race.[9] The plaintiffs contend that vestiges of racially segregated restrooms, cafeterias, change houses, and water fountains remained after that date. Nevertheless, except for one isolated incident in which a black employee was advised by his foreman not to use a certain water fountain, it appears that segregation was eliminated at some time in 1965.

### IV. *Exclusion of Blacks from Certain All-White Departments*

It is undisputed that at the time of the trial nine departments were composed entirely of white employees: Metallurgical; E. W. Pipe Mill Department—Roll Shop; Physical Test Department—Physical Laboratory Technician Line; Combustion and Instrument Department—Electronic Repairman; Ore Engineering; Electrical Maintenance Department; Rolling Mill Department—Janitor Line; Rolling Mill Department—Roll Line; Chemical Laboratory Department—Chemical Line. One black employee testified that he was refused a permanent position in one of these departments, and that he had received no response to his request for transfer to another one of these departments.

Statistics showing a racial disparity establish a *prima facie* case of discrimination in Title VII actions. United States v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L. Ed.2d 237 (1971). In some cases, statistical disparity can establish a violation of Title VII as a matter of law. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970.) The statistical evidence in the instant case establishes an exclusion of blacks from these departments in violation of the Act.

9. Final Pre-Trial Order.

## V. Exclusion of Blacks from Supervisory Positions

 The evidence established a racial disparity in the number of blacks in supervisory positions within the defendant company. Although the Larry Car Operator line in the Coke Plant was composed entirely of blacks, that line, as of the time of the trial, had never had a black foreman. A white foreman who had never worked on jobs in that line supervised those black employees.

Although the greatest concentration of black employees in any department is in the Electric Weld Department—Finishing Mills, there are only two black relief foremen in the Pipe Mill and three in the General Labor Department. On the basis of this uncontroverted evidence, it is clear that, because of the irrelevant factor of race, blacks have been excluded from supervisory positions, in violation of the Act.

## VI. The Failure of the Defendant Union to Represent The Class Fairly

 The local union and international union have negotiated labor agreements and local working conditions that have relegated blacks to the lower paying, less desirable jobs in racially segregated lines of progression. When black employees filed complaints with these unions complaining about discrimination, the unions failed to take any action. On at least one occasion, the local union refused to accept a grievance filed by a black employee relating to the lack of job opportunities available to blacks. When the company proposed the merger of black and white lines of progression in the Electric Weld Pipe Department—Finishing Mills through job class 6, the unions would agree to a merger only through job class 4. Although the merger through job class 6 would not have eliminated the discrimination, it would have gone further toward that end than the unions' proposal. Thus, in violation of the Act, the unions have failed in their duty to represent the black class members without regard to race.

## VII. Back Pay

As part of the authorized relief, the district court may award back pay if it finds that defendants have "intentionally engaged in" or are "intentionally engaging in" an unlawful employment practice. 42 U.S.C.A. § 2000e–5(g). The Fifth Circuit has held that the requirement of intent means only that "the defendant meant to do what he did, that is, his employment practice was not accidental." Local 189, United Papermakers & Paperworkers v. United States, supra at 995–997 n. 15 of 416 F.2d. In briefs submitted on the issue of back pay, defendants present very able arguments concerning factors that they contend militate against the finding of intent to engage in unlawful employment practices. Defendants point to the uncertainty of the law regarding seniority and promotion practices since July 2, 1965; the ambiguity of the pertinent legislative history; the difficulties confronting counsel when predicting the outcome of cases that must necessarily be decided on a case-by-case basis; and the inability of either the company or the union to unilaterally alter the collective bargaining agreement.

 After consideration of these factors as well as the relevant case law of this circuit, the court is nevertheless persuaded that the defendants have intentionally engaged in unlawful employment practices and that the court should exercise its discretion to order an award of back pay. The company and the union may very well have encountered difficulties with the developing law of Title VII. In attempting to allocate among the parties the burden of remedying many years of discrimination in employment, however, the court must choose between placing the burden on the company and union or placing the burden on the wronged employees. A decision to deny back pay is necessarily a determination that victims of employment discrim-

ination should bear their own loss. A balancing of the equities in this case compels the court to conclude that as between the company and the union on the one hand, and the wronged employees on the other, the former should bear the burden of back pay.

The award of back pay is not intended as punishment. Rather, as an integral part of the equitable remedy, Johnson v. Georgia Highway Expressway, Inc., 417 F.2d 1125 (5th Cir. 1969) its purpose is to place the wronged employee, to the extent practical, in a position comparable to his "rightful place." This remedy is not, of course, open-ended; the applicable statute of limitations, as discussed below, provides a limitation on the liability of the parties.

After consideration of the evidence and relevant authorities, as well as the relative positions of the parties, this court further concludes that each of the three defendants shall assume the payment of one-third of the award, except for the period of time during which the international union is not liable under the statute of limitations. During that period, the company and local union shall share the burden equally.

### A. *Statute of Limitations*

As stated earlier in this opinion, this court has subject matter jurisdiction under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., and under the Civil Rights Act of 1866, 42 U.S.C.A. § 1981.[10] The defendant international union contends, however, that since it was not named as a party in the EEOC charges preceding the filing of this action, it cannot be held subject to liability under Title VII. The international union further contends that since it is subject to liability only under Section 1981, it is entitled to rely on the defense of the Texas two-year statute of limitations as of the date it was joined as a party defendant. The court agrees with these contentions.

The international union was not named as a party in the EEOC charges that preceded this action and was not made a party to this action until joined by plaintiffs as an additional party defendant in the amended complaint. A party not named in an EEOC charge, but subsequently joined as a defendant in an action filed in federal court, may not be held subject to liability for back pay. LeBeau v. Libbey, Owens-Ford Company, 484 F.2d 798 (7th Cir. 1973); Bowe v. Colgate-Palmolive Company, 416 F.2d 711, 719 (7th Cir. 1969). Such party is subject to liability for back pay, however, under Section 1981. *E. g.*, Johnson v. Goodyear Tire & Rubber Company, 349 F.Supp. 3, 10–11, 17–19 (D.Tex.1972). Moreover, a defendant in a Section 1981 action for back pay is entitled to rely on the appropriate state statute of limitations. Boudreaux v. Baton Rouge Marine Contracting Company, 437 F.2d 1011, 1016–1017 n. 16 (5th Cir. 1971). Under Texas law, the applicable statute of limitations in an action for back wages—filed by an employee who is employed pursuant to a collective bargaining agreement—is the two-year statute, Vernon's Tex.Rev. Civ.Stat.Ann. art. 5526, § 4 (1958). Kelley v. Southern Pacific Company, 429 S.W.2d 583 (Tex.Civ.App.—El Paso 1968, no writ) (employee's written application for employment considered with the existing collective bargaining agreement is insufficient to constitute a written contract of employment so as to bring it within the four-year statute of limitations; therefore the two-year statute applies). *See also* Rocha v. Missouri Pacific Railroad Co., 224 F.Supp. 566 (D. Tex.1963); Brady v. City of San Antonio, 313 S.W.2d 355 (Tex.Civ.App.— San Antonio 1958), aff'd 159 Tex. 42, 315 S.W.2d 597; *cf.* McGuire v. Baker, 421 F.2d 895 (5th Cir. 1970) (action under 42 U.S.C.A. § 1983 or § 1985 is a suit upon a liability created by statute subject to the Texas two-year statute of limitations). Furthermore, the statute of limitations is tolled as to all poten-

10. See note 1, *infra*.

tial claimants who rely on the same act of discrimination as the basis for their right of recovery by the filing of a complaint with the EEOC. United States v. Georgia Power Company, 474 F.2d 906, 925 (5th Cir. 1973). Thus, the recovery of back wages, denied because of a continuing course of employment discrimination, may cover a period of time not to exceed two years prior to the date of discovery of the discriminatory impact of certain employment practices.

As to the defendant international union, the period of liability may not begin on a date prior to two years before March 22, 1971—the date this court granted plaintiffs leave to amend their complaint and add the international union as a party defendant. As to the other defendants, the local union and company, the period of liability may not begin, of course, prior to two years before April 30, 1966—the date of the earliest claim filed by a named plaintiff, Bryant Cheatam, with the EEOC. *See generally* United States v. Georgia Power Company, *supra* at 922–925.[11]

### B. *Method of Computation*

■ Since the court has determined that it should exercise its discretion to award back pay, the next consideration is the method of computation. The Fifth Circuit has declared that

> The wages sought must be "properly owing to the plaintiffs." This requires positive proof that plaintiff was ordinarily entitled to the wages in question and, being without fault, would have received them in the ordinary course of things but for the inequitable conduct of the party from whom the wages are claimed.

Jinks v. Mays, 464 F.2d 1223, 1226 (5th Cir. 1972); United States v. Georgia

Power Company, *supra* at 922 of 474 F. 2d.

The parties are in general agreement as to the method of computation. The measure of back pay, computed on an individual basis for each member of the affected class, is the difference between (a) actual wages and (b) wages that the employee would have earned but for the racial discrimination preventing him from reaching his "rightful place," as determined by this order, less (c) the "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against." 42 U.S.C.A. § 2000e–5(g). In computing (b), the wages the employee would have earned but for racial discrimination, the period of entitlement to such wages begins on the day that the employee first became entitled, on the basis of ability, physical fitness, and seniority, to fill a permanent opening or temporary vacancy that he would have filled but for racial discrimination. The period of entitlement ends on the date the employee will in all reasonable probability reach his "rightful place." In computing interim earnings under (c), the Fifth Circuit has ruled that

> If a supplemental or moonlight job is one that the discriminatee cannot perform when he wins his new position, the supplemental job is necessarily temporary, provisional or "interim." By contrast, if one can hold his supplemental job and his desired full time job simultaneously and there is reason to believe he will do so, the supplemental job assumes a permanent rather than interim nature. Those earnings would be independent of the position sought and should not be taken into account in back pay calculations.

Bing v. Roadway Express, Inc., *supra.*

11. Interestingly, a recent amendment to Title VII, effective only as to charges pending with the EEOC on March 24, 1972, and therefore inapplicable to the instant case, covers the Title VII limitations problem and coincides with the applicable Texas statute. This amendment provides that "back pay

liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission." 42 U.S.C.A. § 2000e–5(g) (Supp.1973), amending 42 U. S.C.A. § 2000e–5(g) (1970). See Bing v. Roadway Express, Inc., 485 F.2d 441 n. 14 (5th Cir. 1973).

This method of computation necessarily envisions that the court must trace the hypothetical progress of every member of every subclass through each line of progression through every promotion, demotion, or layoff. The parties are in agreement that a master should be appointed to make these rather complex computations and the court concurs.[12] Nevertheless, it may well be that computation of the wages a particular employee would have earned in filling a temporary vacancy is so complicated as to require an alternate method of computation for that specific problem. If this kind of problem or any other problem relating to the method of computation should arise, the master will be directed to report the matter to this court. The court will then resolve the matter in a manner deemed appropriate, including the holding of additional hearings, if necessary.

## VIII. *Relief*

It is declared that the maintenance of racially segregated lines of progression in the Blast Furnace, Cast Iron Pipe Foundry, Coke Ovens and Coal Chemicals, Open Hearth, Electric Weld Pipe Mills—Finishing and Shipping Departments, for a period of time after July 2, 1965, violated the Act. It is

Ordered that the defendant company and the defendant local union are permanently enjoined from failing to abide by the nondiscriminatory lines of progression, agreed to, with two exceptions, by all parties submitting proposals for merger of the lines. (The two exceptions concern promotion and demotion route of the Foundry Craneman in the Blast Furnace Department and certain provisions of the training program in the Masonry Department, which have been resolved by the court. See Appendices A–I.) It is further

Ordered that the defendant company and the defendant local union are per-

manently enjoined from failing to abide by nondiscriminatory transfer, promotion, and seniority systems in conformance with the combined proposals of the parties, as follows:

### Blast Furnace Department

(A) Members of the affected class shall consist of all black persons, whether currently employed or retired, who were employees of the company in this department on or after July 2, 1965, and who were either (1) hired before March 25, 1966, the date of the merger of the pool jobs under the segregated lines of progression, or (2) hired on or after March 25, 1966, but who, nevertheless, occupied permanent jobs in an all-black line of progression.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty days, and temporary vacancies of less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL–CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968.

(C) Department seniority shall govern all promotions arising from a permanent opening or temporary vacancy and all demotions when both members and nonmembers of the affected class are bidding for the same jobs, in either (1) their present lines of progression or (2) in a sequence other than the one they presently occupy, if exercising their rights under the transfer provision. Under the transfer provision, members of the affected class who declare to the company in writing within thirty (30) days of the date of this order will be permitted *one* opportunity to transfer to the entry job in a sequence within their department (other than the one

---

12. For example, the master will have to decide whether in all reasonable probability a particular employee, absent discrimination, would have requested a waiver.

they currently occupy) without forfeiting department seniority.[13]

(1) When relying on tests of ability or physical fitness for purposes of promotion that have the effect of impeding in any way the attempts of the members of the affected class to achieve their rightful place as contemplated by this order, the company shall have the burden of demonstrating why such tests that were not required on the basis of business necessity *before* the date of this order are so required *after* the date of this order.

(2) The company may require that members of the affected class skipping jobs in the lines of progression or exercising their transfer rights undergo a trial, or break-in, period to determine whether they possess the requisite ability and physical fitness to perform the work. The trial period, if required, shall not be less than a reasonable period of time. In the absence of a showing of business necessity to the contrary, a reasonable trial period shall be five (5) working days.

(a) If at the conclusion of a trial, or break-in, period the company concludes that a particular member of the affected class does not have the ability to perform the job for which he has been in training, the company shall so inform such employee and the union in writing;

(b) The company shall report quarterly (as of the date of this order) to this court the names of all members of the affected class who bid for jobs on the basis of their department seniority but who are denied the position because of lack of ability or physical fitness to perform the work;

(c) Members of the affected class skipping jobs in the line of progression or exercising their transfer rights shall not be paid less than the rate of pay of their current permanent jobs or temporary jobs lasting at least thirty (30) days (*i. e.*, shall be "red circled" at their current rate of pay);[14] and

(d) In no instance shall such employee be reassigned to a job and line other than the one he occupied immediately prior to his rejection for a job for lack of the requisite ability or physical fitness.

*Cast Iron Pipe Foundry Department*

(A) Members of the affected class shall consist of all black persons, whether currently employed or retired, who were employees of the company in this department on or after July 2, 1965, and who were either (1) hired before March 23, 1967, the date of the merger of the pool jobs under the segregated lines of progression, or (2) hired on or after March 23, 1967, but who nevertheless occupied permanent jobs in an all-black line of progression.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty (30) days, and temporary vacancies less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, Unit-

13. Cf. United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972) (holding that black employees who were victims of unlawful discrimination should be given another opportunity to transfer although they previously refused to transfer).

14. There is ample Title VII precedent for this relief. United States v. Bethlehem Steel Corp., 446 F.2d 652, 660–661 (2d Cir. 1971), citing Robinson v. Lorillard Corporation, 319 F.Supp. 835, 839, 843 (M.D.N.C. 1970); Clark v. American Marine Corporation, 304 F.Supp. 603, 608 (E.D.La.1969); and United States v. Local 189, United Papermakers & Paperworkers, 301 F.Supp. 906, 919 (E.D.La.), aff'd, 416 F.2d 980 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). Absent this relief, "a discriminatorily assigned employee will have little incentive to transfer if he loses money or job seniority by doing so." United States v. Bethlehem Steel Corporation, *supra* at 661 of 446 F.2d.

ed Steelworkers of America, AFL–CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968.

(C) Department seniority shall govern all promotions arising from a permanent opening or temporary vacancy and all demotions when both members and nonmembers of the affected class are bidding for the same jobs, in either (1) their present lines of progression or (2) in a sequence other than the one they presently occupy if exercising their rights under the transfer provision. Under the transfer provision, members of the affected class who declare to the company in writing within thirty (30) days of the date of this order or within thirty (30) days of the date of rejection for a job under the first transfer will be permitted *two* opportunities, assuming a rejection on the first, to transfer to the entry job in a sequence within their department (other than the one they currently occupy) without forfeiting department seniority.

When both members and nonmembers of the affected class are bidding for the same positions as Temperature Observer, Mold Spray Man, Mold Reconditioner, Package Operator (formerly governed by job seniority), the following rules shall apply: (1) Department seniority shall govern all promotions arising from permanent openings or from temporary vacancies; (2) former sequence seniority and seniority in the new job shall govern demotions arising from a reduction in force in which the employee returns to a job in another sequence that he occupied immediately prior to his current job.

(1) When relying on tests of ability or physical fitness for purposes of promotion that have the effect of impeding in any way the attempts of the members of the affected class to achieve their rightful place as contemplated by this order, the company shall have the burden of demonstrating why such tests that were not required on the basis of business necessity *before* the date of this order are so required *after* the date of this order.

(2) The Company may require that members of the affected class skipping jobs, in the lines of progression or exercising their transfer rights undergo a trial, or break-in, period to determine whether they possess the requisite ability and physical fitness to perform the work. The trial period, if required, shall not be less than a reasonable period of time. In the absence of a showing of business necessity to the contrary, a reasonable trial period shall be five (5) working days.

(a) If at the conclusion of a trial, or break-in, period the company concludes that a particular member of the affected class does not have the ability to perform the job for which he has been in training, the company shall so inform such employee and the union in writing;

(b) The company shall report quarterly (as of the date of this order) to this court under its continuing jurisdiction the names of all members of the affected class who bid for jobs on the basis of their department seniority but who are denied the position because of lack of ability or physical fitness to perform the work;

(c) Members of the affected class skipping jobs in the line of progression or exercising their transfer rights shall not be paid less than the rate of pay of their current permanent jobs or temporary jobs lasting at least thirty (30) days (*i. e.*, shall be "red circled" at their current rate of pay); and

(d) In no instance shall such employee be reassigned to a job and line other than the one he occupied immediately prior to his rejection for a job for lack of the requisite ability or physical fitness.

### Coke Ovens and Coal Chemicals Department

(A) Members of the affected class shall consist of all black persons, whether currently employed or retired, who were employees of the company in this department on or after July 2, 1965, and who were either (1) hired before December 14, 1966, the date of the merger of the pool jobs under the segregated lines of progression, or (2) hired on or after December 14, 1966, but who nevertheless occupied permanent jobs in an all-black line of progression.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty days, and temporary vacancies of less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL–CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968.

(C) The position of Patcher, while not shown on the Coke Oven line of progression, Appendix C, is in this department. When both members and nonmembers of the affected class are bidding for this position, the following rules shall apply: (I) Department seniority shall govern all promotions arising from permanent openings or from temporary vacancies; (II) Former sequence seniority and seniority in the new job shall govern demotions arising from a reduction in force in which the employee returns to a job in another sequence that he occupied immediately prior to his current job.

(1) When relying on tests of ability or physical fitness for purposes of promotion that have the effect of impeding in any way the attempts of the members of the affected class to achieve their rightful place as contemplated by this order, the company shall have the burden of demonstrating why such tests that were not required on the basis of business necessity *before* the date of this order are so required *after* the date of this order.

(2) The company may require that members of the affected class skipping jobs in the lines of progression undergo a trial, or break-in, period to determine whether they possess the requisite ability and physical fitness to perform the work. The trial period, if required, shall not be less than a reasonable period of time. In the absence of a showing of business necessity to the contrary, a reasonable trial period shall be five (5) working days.

(a) If at the conclusion of a trial, or break-in, period, the company concludes that a particular member of the affected class does not have the ability to perform the job for which he has been in training, the company shall so inform such employee and the union in writing;

(b) The company shall report quarterly (as of the date of this order) to this court under its continuing jurisdiction the names of all members of the affected class who bid for jobs on the basis of their department seniority but who are denied the position because of lack of ability or physical fitness to perform the work;

(c) Members of the affected class skipping jobs in the line of progression or exercising their transfer rights shall not be paid less than the rate of pay of their current permanent jobs or temporary jobs lasting at least thirty (30) days (*i. e.,* shall be "red circled" at their current rate of pay); and

(d) In no instance shall such employee be reassigned to a job and line other than the one he occupied immediately prior to his rejection for a job for lack of the requisite ability or physical fitness.

(3) An employee who has occupied the job of Door Cleaner, job class 5, for at least sixty (60) working days, in either a permanent or temporary capacity, shall not be required to work further in that job as a condition for promotion to Screener Helper, job class 6, or Quencher Car Operator, job class 7.

### Open Hearth Department

(A) Members of the affected class shall consist of all black persons, whether currently employed or retired, who were employees of the company in this department on or after July 2, 1965, and who were either (1) hired before May 22, 1966, the date of the merger of the pool jobs under the segregated lines of progression, or (2) hired on or after May 22, 1966, but who nevertheless occupied permanent jobs in an all-black line of progression.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty days, and temporary vacancies of less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL–CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968.

(C) Department seniority shall govern all promotions arising from a permanent opening or temporary vacancy and all demotions when both members and non-members of the affected class are bidding for the same jobs, in either (1) their present lines of progression or (2) in a sequence other than the one they presently occupy if exercising their rights under the transfer provision. Under the transfer provision, members of the affected class who declare to the company in writing within thirty (30) days of the date of this order or within thirty (30) days of the date of rejection for a job under the first transfer will be permitted *two* opportunities, assuming a rejection on the first, to transfer to the entry job in a sequence within their department other than the one they currently occupy without forfeiting department seniority.

(1) When relying on tests of ability or physical fitness for purposes of promotion that have the effect of impeding in any way the attempts of the members of the affected class to achieve their rightful place as contemplated by this order, the company shall have the burden of demonstrating why such tests that were not required on the basis of business necessity *before* the date of this order are so required *after* the date of this order.

(2) The company may require that members of the affected class skipping jobs in the lines of progression or exercising their transfer rights undergo a trial, or break-in, period to determine whether they possess the requisite ability and physical fitness to perform the work. The trial period, if required, shall not be less than a reasonable period of time. In the absence of a showing of business necessity to the contrary, a reasonable trial period shall be five (5) working days. It is provided, however, that the jobs of First Helper, Charging Car Operator, Ladle Craneman, Hot Metal Craneman, and First, Second and Third Ladleman shall not be available to an employee who has not worked the job immediately below each of these jobs.

(a) If at the conclusion of a trial, or break-in, period the company concludes that a particular member of the affected class does not have the ability to perform the job for which he has been in training, the company shall so inform such employee and the union in writing;

(b) The company shall report quarterly (as of the date of this order) to this court under its continuing jurisdiction the names of all members of the affected class who bid for jobs on the basis of their department seniority but who are

denied the position because of lack of ability or physical fitness to perform the work;

(c) Members of the affected class skipping jobs in the line of progression or exercising their transfer rights shall not be paid less than the rate of pay of their current permanent jobs or temporary jobs lasting at least thirty (30) days (*i. e.*, shall be "red circled" at their current rate of pay); and

(d) In no instance shall such employee be reassigned to a job and line other than the one he occupied immediately prior to his rejection for a job for lack of the requisite ability or physical fitness.

(3) Except for Amendment No. 1, dated June 16, 1967, and Revised Amendment No. 2, dated March 24, 1971, Local Working Condition No. 12, by agreement of all parties, shall no longer apply.

### Electric Weld Pipe Mills Department, Finishing Division

(A) Members of the affected class shall consist of all black persons, whether currently employed or retired, who were employees of the company in this department on or after July 2, 1965, and who were either (1) hired before July 5, 1970, the date of the merger of the pool jobs under the segregated lines of progression, or (2) hired on or after July 5, 1970, but who nevertheless occupied permanent jobs in an all-black line of progression.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty days, and temporary vacancies of less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL-CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968; *provided, however,* that an increase of forces for purposes of determining a permanent opening shall be defined as one lasting more than ten (10) working days; that an increase of forces for purposes of determining a temporary vacancy shall be defined as one lasting ten (10) working days or less; that a decrease in forces for purposes of determining a permanent demotion shall be defined as one lasting more than ten (10) working days; and that a decrease in forces for purposes of determining a temporary demotion shall be defined as one lasting ten (10) days or less.

(C) Department seniority shall govern all promotions arising from a permanent opening or from a temporary vacancy lasting more than eight (8) working days when both members and nonmembers of the affected class are bidding for the same jobs, in either (1) their present lines of progression or (2) in a sequence other than the one they presently occupy, if exercising their rights under the transfer provisions. If the company chooses to fill a temporary vacancy of eight (8) working days or less, such vacancy shall be filled on the basis of department seniority by a pushup in the affected temporary line of progression of an employee working the shift on which the vacancy occurs.

(1) When relying on tests of ability or physical fitness for purposes of promotion that have the effect of impeding in any way the attempts of the members of the affected class to achieve their rightful place as contemplated by this order, the company shall have the burden of demonstrating why such tests that were not required on the basis of business necessity *before* the date of this order are so required *after* the date of this order.

(2) The company may require that members of the affected class skipping jobs in the lines of progression undergo a trial, or break-in, period to determine whether they possess the requisite ability and physical fitness to perform the work. The trial period,

if required, shall not be less than a reasonable period of time. In the absence of a showing of business necessity to the contrary, a reasonable trial period shall be five (5) working days.

(a) If at the conclusion of a trial, or break-in, period the company concludes that a particular member of the affected class does not have the ability to perform the job for which he has been in training, the company shall so inform such employee and the union in writing;

(b) The company shall report quarterly (as of the date of this order) to this court under its continuing jurisdiction the names of all members of the affected class who bid for jobs on the basis of their department seniority but who are denied the position because of lack of ability or physical fitness to perform the work;

(c) Members of the affected class skipping jobs in the line of progression or exercising their transfer rights shall not be paid less than the rate of pay of their current permanent jobs or temporary jobs lasting at least thirty (30) days (i. e., shall be "red circled" at their current rate of pay) ; and

(d) In no instance shall such employee be reassigned to a job and line other than the one he occupied immediately prior to his rejection for a job for lack of the requisite ability or physical fitness.

*Transportation Department*

(A) Members of the affected class shall consist of all black persons, whether currently employed or retired, who were employees of the company in this department on or after July 2, 1965, and who were hired in the Track line of progression before August 5, 1968.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty days, and temporary vacancies of less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL–CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968.

(C) Department seniority shall govern all promotions arising from a permanent opening or temporary vacancy and all demotions when both members and nonmembers of the affected class are bidding for the same jobs in their present lines of progression.

(1) Members of the affected class employed in the former Track line of progression who so declare in writing to the company within thirty (30) days of the date of this order shall have one (1) option to transfer to the job of Switchman Helper, as permanent openings occur. Such employees shall be credited in their new department with all their former department seniority and shall forfeit seniority in Raw Material and Service Department.

(2) Local Working Condition No. 2 shall apply to the Yard Switching line of progression. Members of the affected class exercising their right to transfer under paragraph (1) must remain at the Switchman Helper level for at least thirty (30) days before they are eligible to bid for promotions as outlined in Local Working Condition No. 2.

(3) The company may require members of the affected class exercising their rights of transfer under paragraph (1) to undergo a trial, or break-in, period of thirty (30) working days, to determine whether they possess the requisite ability and physical fitness to perform the work.

(a) If at the conclusion of a trial, or break-in, period, the company concludes that a particular member

of the affected class does not have the ability to perform the job for which he has been in training, the company shall so inform such employee and the union in writing;

(b) The company shall report quarterly (as of the date of this order) to this court under its continuing jurisdiction the names of all members of the affected class who bid for jobs on the basis of their department seniority but who are denied the position because of lack of ability or physical fitness to perform the work;

(c) Members of the affected class exercising their transfer rights shall not be paid less than the rate of pay of their current permanent jobs or temporary jobs lasting at least thirty (30) days (*i. e.*, shall be "red circled" at their current rate of pay) ; and

(d) In no instance shall such employee be reassigned to a job and line other than the one he occupied in the Raw Materials and Service Department immediately prior to his rejection for a job for lack of the requisite ability or physical fitness; and in no instance shall such employee forfeit his seniority in the Raw Material and Service Department.

(4) A member of the affected class exercising his transfer right may choose, within thirty (30) days following his transfer, to return to his former job and department without forfeiting seniority in the Raw Material and Service Department. A member of the affected class *not* exercising his transfer right within the initial thirty-day period may choose to exercise his transfer right within thirty (30) days of a six-month interval following the initial thirty-day period.

(5) When relying on tests of ability or physical fitness for purposes of promotion that have the effect of impeding in any way the attempts of the members of the affected class to achieve their rightful place as contemplated by this order, the company shall have the burden of demonstrating why such tests that were not required on the basis of business necessity *before* the date of this order are so required *after* the date of this order.

*Shipping Department*

(A) Members of the affected class shall consist of all black persons, whether currently employed or retired, who were employees of the company in this department on or after July 2, 1965, and who were hired before May 3, 1970.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty days, and temporary vacancies of less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL–CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968.

(C) Department seniority shall govern all promotions arising from a permanent opening or temporary vacancy and all demotions when both members and nonmembers of the affected class are bidding for the same jobs, in their present lines of progression.

(1) The company shall submit to the court within ninety (90) days of the date of this order a job-related test of ability to perform the work required for promotion to Forklift and Carrier Operation, job class 9, that meets the test of business necessity. When relying on any other tests of ability or physical fitness for purposes of promotion that have the effect of impeding in any way the attempts of the members of the affected class to achieve their rightful place as contemplated by this order, the company shall have the burden of demonstrating why such tests that were not re-

quired on the basis of business necessity *before* the date of this order are so required *after* the date of this order.

(2) Local Working Condition No. 7, effective May 3, 1970, shall govern, subject to the following provisions, as agreed by the parties:

(a) Articles III and IV are declared null and void.

(b) Article V is amended to omit the words "subject to the rights of the employee in Paragraphs III and IV."

(c) The second paragraph of Article VI is amended to read as follows: "No employee shall have the right to take the test or tests more than one time in an eight-month period, except in the case of failure due to physical limitations. When such physical limitations have been corrected, and such corrections verified by the Company's Medical Director, the employee or employees so affected may be retested."

(3) The company may require that members of the affected class skipping jobs in the lines of progression or exercising their transfer rights undergo a trial, or break-in, period to determine whether they possess the requisite ability and physical fitness to perform the work. The trial period, if required, shall not be less than a reasonable period of time. In the absence of a showing of business necessity to the contrary, a reasonable trial period shall be five (5) working days.

(a) If at the conclusion of a trial, or break-in, period the company concludes that a particular member of the affected class does not have the ability to perform the job for which he has been in training, the company shall so inform such employee and the union in writing;

(b) The company shall report quarterly (as of the date of this order) to this court under its continuing jurisdiction the names of all members of the affected class who bid for jobs on the basis of their department seniority but who are denied the position because of lack of ability or physical fitness to perform the work;

(c) Members of the affected class skipping jobs in the line of progression or exercising their transfer rights shall not be paid less than the rate of pay of their current permanent jobs or temporary jobs lasting at least thirty (30) days (*i. e.*, shall be "red circled" at their current rate of pay); and

(d) In no instance shall such employee be reassigned to a job and line other than the one he occupied immediately prior to his rejection for a job for lack of the requisite ability or physical fitness.

*Masonry Department*

(A) Members of the affected class shall consist of all black persons who are employees of the company working in the Masonry Department and who were hired before the date of this order.

(B) Permanent openings, inter-sequence transfers, temporary vacancies of more than thirty days, and temporary vacancies of less than thirty days, to the extent their interpretation is not inconsistent with other provisions in this order, shall be governed by the labor-management agreements currently in effect: Agreement Between Lone Star Steel Company and Local No. 4134, United Steelworkers of America, AFL–CIO, dated October 16, 1971; Local Working Condition No. 14, effective February 29, 1968.

(C) Department seniority shall govern all promotions arising from a permanent opening or temporary vacancy and all demotions when both members and nonmembers of the affected class are bidding for the same jobs in their present line of progression.

(D) The company shall establish a training program for the job of Brick-

mason, in accordance with the program adopted by the court after substantial agreement by the parties. See Appendix I.

(1) Members of the affected class shall be given first preference for training.

(2) The company shall have the right to establish all standards and tests for the training program; *provided, however,* that such standards and tests do not discriminate on the grounds of race.

(3) The company shall have the right, subject only to paragraphs (D) (1) and (2) above, to determine the number of, and make the selection of, the employees who enter the training program. The company shall also provide notice of openings and supply written application forms to all employees of the Masonry Department.

(4) When a demotion of a trainee arising from a reduction in forces or a disqualification of a trainee occurs, such trainee shall have the right to exercise his former Masonry Department seniority and his length of trainee service to place himself on existing jobs in the Masonry Department line of progression, commensurate with his physical fitness and ability, but in no event higher in the line of progression than the job he was working at the time of his entrance in the training program. Upon satisfactory completion of the training program and the assignment to the job of Brickmason, the trained employee shall forfeit his seniority rights as outlined above.

It is further

Ordered that the defendant company is permanently enjoined from re-instituting segregation on the basis of race of any facilities available to company personnel or employees. It is further

Ordered that the defendant company is permanently enjoined from denying blacks an opportunity to apply for work in any department on the basis of race. It is further

Ordered that the defendant company is permanently enjoined from denying blacks an opportunity to apply for supervisory positions in any department on the basis of race. It is further

Ordered that the defendant local union and international union are permanently enjoined from failing to represent, in good faith, black employees of the defendant company in any activity related to labor-management problems, including those that may arise from the entry of this order. It is further

Ordered that the defendant company produce within sixty (60) days of the date of this order a current list of employees or former employees that come within the definition of the classes of plaintiffs in each of the eight departments discussed in this section of the order. It is further

Ordered that any employee otherwise entitled to a promotion under the seniority rules set forth herein who now has in force and effect a written waiver of promotion to a higher job shall be offered said promotion regardless of such waiver and may at that time revoke such waiver and the same shall not then be a bar to such promotion. Otherwise, the present waiver system shall remain undisturbed. The company shall prepare and maintain a written record which must be signed by all employees who are offered a promotion but refuse to revoke a waiver now in force which thereby prohibits the promotion. It is further

Ordered that an employee's right to receive a "red circle" rate of pay as provided in various provisions of this order shall terminate: (a) when the employee reaches a permanent job class in his new sequence equivalent to the job class which he left in his former sequence; (b) when he signs a waiver of his right to be promoted further; (c) when his further movement up the new sequence is halted by reason of his in-

ability to perform the work or lack of physical ability; or, (d) when he reaches his "rightful place" in his new sequence. It is further

Ordered that the lines of progression shown in the Appendix may be changed by the company from time to time in accordance with the terms of the basic labor-management agreement; provided, that such changes shall not adversely affect the rights given to the affected class by this order, and that notice of such proposed changes will be given, by letter, to the court and plaintiffs' counsel, and to the members of the affected class by posting such notice at appropriate places in the steel plant ten (10) days or more before the line of progression is changed. It is further

Ordered that the defendant company shall have thirty (30) days from the date of this order to complete the installation and actual operation of the merged lines of progression shown in the Appendix. Promotions made before the lines are actually merged will not be considered to be permanent promotions. It is further

Ordered that the defendant company, defendant local union, and the defendant international union shall each pay one-third of the amount of back wages due the members of the affected class as determined by the special master; provided, however, that during the period of time during which the international union is not liable under the statute of limitations as determined in this order, the defendant company and defendant local union shall each pay one-half of the amount of such back wages. It is further

Ordered that all the parties to this civil action shall meet within thirty (30) days of the date of this order and shall nominate a special master to be appointed by this court pursuant to Rule 53 of the Federal Rules of Civil Procedure. If the parties are unable to agree on a selection within that period of time, the court will make the selection.

Since the court determines that plaintiffs should recover reasonable attorney's fees as part of the costs pursuant to 42 U.S.C.A. § 2000e–5(k), and that the defendant company, the defendant local union, and the defendant international union shall each pay one-third of such fee and other costs, it is

Ordered that all parties to this civil action shall meet within thirty (30) days of the date of this order and shall attempt in good faith to agree on the amount of reasonable attorney's fees. If the parties are unable to agree within that period of time, the court will set the fee.

Counsel for plaintiffs are Ordered to prepare an abstract of this order within twenty (20) days of the date of this order; and upon agreement by counsel for all parties and approval by the court as to its form, the abstract shall be posted at appropriate places in the defendant steel plant for a period of thirty (30) consecutive days. If the parties are unable to agree to the form of such abstract within twenty (20) days from the date of this order, the court will designate its form. The time provided under this order to assert rights shall commence thirty (30) days after the abstract has been posted.

The court retains jurisdiction of this civil action for all purposes, including the entry of any and all further orders that may become necessary for the purpose of enforcing or modifying this order.