Henry Lee ROGERS et al.,
Appellants-Cross-Appellees,

v.

INTERNATIONAL PAPER COMPANY
et al., Appellees-Cross-Appellants.

Nos. 74–1086, 74–1087, 74–1101
and 74–1115.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1974.

Decided Jan. 7, 1975.

Rehearings Denied Feb. 14, 18, 1975.

Rehearing En Banc Denied Feb.
14, 1975.

Philip E. Kaplan, Little Rock, Ark., and Deborah M. Greenberg, New York City, made argument for Rogers, and others.

Thompson Powers and James D. Hutchinson, Washington, D. C., made argument for Int. Paper Co.

William L. Massey, Youngdahl & Larrison, Little Rock, Ark., made argument for Paperworkers.

Eugene R. Warren, Little Rock, Ark., made argument for Local 2033.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Henry Rogers, Lee Smith and N. A. Thompson, on behalf of themselves and other blacks similarly situated, brought this action against International Paper Company [hereinafter I.P.] and I.P. unions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e), 42 U.S.C. § 1981, and 29 U.S.C. §§ 151 et seq. The complaint alleges racially discriminatory employment policies were practiced by I.P. at its Pine Bluff Mill in four general employment classifications: production departments, maintenance craft jobs, office and clerical jobs, and supervisory positions.

After a lengthy trial and upon detailed factual evidence, the district court concluded, with respect to production jobs, that although I.P. had clearly discriminated in past job assignments and although its seniority system had perpetuated the effects of that past discrimination, I.P.'s Memorandum of Under-

standing negotiated between I.P. and the Office of Federal Contract Compliance under Executive Order 11,246 substantially eliminated the effects of the former discriminatory policy. Respecting maintenance craft jobs the court concluded there was no overt discrimination against blacks and the tests administered as a prerequisite to employment for those jobs were not shown to have a racially disparate impact, nor, in any event, to be unrelated to job performance. Third, the district court noted there had been no hiring for office and clerical positions for a significant period of time and concluded that I.P. had undertaken effective measures to remedy any discrimination in office and clerical employee selection by establishing a list of qualified black clerical applicants. The district court did not address the question of discrimination in supervisory employee selection. Upon those bases, the court denied injunctive relief. For the reasons hereinafter set forth, we reverse and remand.

## I.  INTERNAL STRUCTURE.

The Pine Bluff Mill, located in Jefferson County, Arkansas, is one of a number of such facilities maintained by I.P. for treatment and conversion of wood into paper. It commenced production in 1958 and, at the time of trial, employed 1443 employees, of which 118 were black. The population of Jefferson County is 30% black. The mill consists primarily of production departments which process wood into paper and maintenance craft departments which are responsible for repairing and maintaining the machinery used at the mill. Also employed at Pine Bluff are supervisory personnel and office and clerical personnel.[1]  Of the 160

supervisory personnel, one accountant hired in 1969 is black.

Production workers are organized into ten departments [2] which, in turn, are subdivided into various lines of progression [LOP] based either upon the type of job performed or geographic proximity to other jobs in a particular LOP. As a worker ascends in the LOP his pay rate increases. Associated with many of these departments are labor pools into which employees are hired by I.P. and from which laborers are assigned to various entry level jobs in a LOP as temporary or permanent vacancies therein occur. Also in the production area, but not associated with any specific department or LOP, are various miscellaneous hourly jobs. Under the collective bargaining agreements in effect at Pine Bluff, promotion, demotion, layoff and recall are determined on the basis of seniority of which there are three types: company or mill seniority, department seniority, and job seniority.[3]

Prior to 1962 all of the production jobs were segregated on the basis of race. The Wood Yard Department was the only production department permitting blacks. Various miscellaneous jobs were designated black jobs and the General Yard Crew was a black labor pool. The black jobs were generally less desirable, lower paying, and more physically demanding. Subsequent to 1962 this situation changed as will be hereafter discussed.

The maintenance crafts jobs are organized into three departments [4] and are represented by various skilled crafts,[5] both journeyman and apprentice status. These are the highest paying hourly positions at I.P. The company, based upon

---

1.  In this appeal neither the plaintiffs nor the United States Equal Employment Opportunity Commission challenge the findings of the district court relating to office and clerical jobs.

2.  Wood Yard, Pulp Mill, Laboratory, Beater Room, Machine Room, Polyethylene Extruder, Finishing and Shipping, Storeroom, Equipment, and Power Plant.

3.  Company seniority is the length of service with the company. Department seniority is

the length of service in a department or line of progression. Job seniority is the length of service on a job in a line of progression.

4.  Maintenance, Electrical, and Instrument.

5.  Pipefitters, Carpenters, Insulators, Millwrights, Welders, Steelworkers, Boilermakers, Sheet Metal Workers, Machinists, and Auto Mechanics.

test results achieved on a battery of tests, effectuates hiring of these employees into the apprenticeship programs. Applicants therefor must be under 25 years of age, or 29 if the applicant is an I.P. incumbent employee. Job training and union membership follow. Until 1962 the bargaining representatives for these crafts were segregated white unions. Thus the maintenance crafts at Pine Bluff were all white. At the time of trial, two black apprentices had been hired into the 255 skilled craft positions at the Pine Bluff Mill.

## II. SUPERVISORY PERSONNEL.

In a recent class action challenge alleging employment discrimination we have noted that employment policies affecting supervisory and managerial positions are not insulated from the reaches of Title VII enforcement. Gilmore v. Kansas City Terminal Ry., 509 F.2d 48 (8th Cir., 1975). In that case we held that statistical data may establish a prima facie case of employment discrimination, specifically in the context of supervisory personnel, and that such a showing shifts the burden to the employer to rebut the inference that racial considerations have dictated employment choices. Id. at 52. When a defense of lack of minority qualification is interposed by the employer, we there held that an employer may rebut the prima facie case of discrimination upon a showing that the required qualifications have a manifest relationship to the employment in question. Gilmore v. Kansas City Terminal Ry., supra, at 52. Thereafter, it is open to plaintiffs to demonstrate a violation of Title VII on either of two independent bases: "that the employment policies reflect present discriminatory conduct or that current policies, though neutral on their face, carry forward vestiges of past discrimination." Id.

Here, by means of the statistic that only one black has been hired for a supervisory position, the plaintiffs have made a prima facie showing of racial discrimination by I.P. in its employee selection policies for supervisory personnel.[6] The record does not demonstrate that I.P. interposed any defense to this aspect of the class action complaint. Because the trial court, in defining the class, excluded supervisory employees, and since I.P. did not present evidence to rebut the prima facie statistical showing of racial discrimination, we remand this aspect of the case to the trial court for further hearings and a determination as to whether or not there has been racial discrimination in the hiring of supervisory employees by I.P. If the trial court determines there has been such discrimination it shall then fashion an appropriate remedy. In resolving this issue the district court should apply the following standards.

### A. Current Discrimination.

Proof of intent. Notwithstanding the provision in Title VII allowing injunctive relief and back pay only where the respondent has intentionally engaged in unlawful practice, 42 U.S.C. § 2000e–5(g), courts have established that proof of discrimination does not require proof of intent to discriminate. All that is required is that the employment practice not be accidental. See, e. g., Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 996 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). The Supreme Court has adopted this interpretation. In Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), the Court stated that, "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motiva-

6. Even though proof was offered and received as to supervisory employees, the district court defined the class in this action as

"Those black employees employed and still employed since the commencement of this cause and all future employees of International Paper Company at its Pine Bluff, Arkansas, mill who are members or eligible to be members of Pulp and Sulphite Workers; Locals 898 and 946; Papermakers; Locals 731, 735, and 833; and IBEW."

On remand the district court should redefine the class to include supervisory employees.

tion." *See also* United States v. N. L. Industries, 479 F.2d 354, 361 (8th Cir. 1973) (and cases cited therein).

■ *Overt discrimination.* Overt discrimination may be demonstrated by the production of qualified minority applicants for past vacancies who were rejected for a less qualified white person. If such employer conduct is established, a deliberate purpose to discriminate may be inferred and close judicial scrutiny of employment practices is warranted. In Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1382 (4th Cir. 1972), the court observed:

> Courts have often observed that proof of overt racial discrimination in employment is seldom direct. Recognizing this, we have found "error in limiting Title VII to present specific acts of racial discrimination," and it is now well established that courts must also examine statistics, patterns, practices and general policies to ascertain whether racial discrimination exists. (Citations omitted.)

■ *Recruitment.* Evidence of discrimination by design might also be based upon a history of minimal recruitment efforts in publicizing vacancies and openings in supervisory and management positions. The passive nature of past recruitment together with the failure to undertake affirmative recruitment efforts after the passage of Title VII may justify a finding of discriminatory conduct. United States v. N. L. Industries, *supra,* 479 F.2d at 368; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426–427 (8th Cir. 1970); United States v. Sheet Metal Workers Local 36, 416 F.2d 123, 139–140 (8th Cir. 1969).

■ *Examination of criteria.* A final method in the assessment of present dis-

criminatory conduct is the examination of the supervisory selection and promotion criteria employed by I.P. Such criteria are especially susceptible to employer practices which discriminate in fact under a facade of apparent neutrality. Griggs v. Duke Power Co., *supra,* 401 U.S. at 431, 91 S.Ct. 849, in holding unlawful an employer's use of a written test not shown to have been related to job performance, teaches that employee selection criteria must be scrutinized. Under *Griggs,* an employer must demonstrate that hiring and promotional requirements with a racially disparate effect "have a manifest relationship to the employment in question." *Id.* at 432, 91 S.Ct. at 854.

■ Where objective criteria are employed the EEOC guidelines on Employer Selection Procedures, 29 C.F.R. §§ 1607 et seq., cited with approval by the Court in *Griggs, supra,* 401 U.S. at 434, 91 S.Ct. 849, as expressing the will of Congress, control. They require generally that empirical evidence must demonstrate a significant correlation between the test employed and important elements of work behavior.

■ Greater possibilities for abuse, however, are inherent in subjective definitions of employment selection and promotion criteria. Yet they are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about hiring and promotion in supervisory and managerial jobs cannot realistically be made using objective standards alone. Thus, it is especially important for courts to be sensitive to possible bias in the hiring and promotion process arising from such subjective definition of employment criteria. The EEOC guidelines,[7] the Executive Or-

---

7. Those guidelines, which set forth validation standards for objective professionally developed tests, also state that:

> Selection techniques other than tests . . . may be improperly used so as to have the effect of discriminating against minority groups. . . . Where there are data suggesting employment discrimination, the person may be called upon to

present evidence concerning the validity of his unscored procedures as well as of any tests which may be used, the evidence of validity being of the same types referred to in §§ 1607.4 and 1607.5.

29 C.F.R. § 1607.13 (1973). That passage suggests that even subjective criteria must be validated by the employer.

der program,[8] and the courts have all established the requirement of, and in most cases a measure for, examining subjective hiring and promotion criteria. At the very least, it is necessary to identify the goals underlying the subjective criteria through a job analysis. Examination of those goals might reveal underlying personal biases or discriminatory stereotype classifications. *See, e. g.,* EEOC Dec. No. 72–0721 (Dec. 27, 1971), 4 FEP Cases 439 (1972). It may additionally appear that subjective preference is accorded factors which are discriminatory, as for example, education accomplishment when such is not shown to be related to job performance,[9] a history of arrest records,[10] a history of wage garnishment,[11] or personal references that are nepotistic or culturally biased.[12] If there is any evidence of a discriminatory policy, courts have in the past closely circumscribed and even rejected practices of personal interviews,[13] supervisory recommendations,[14] and other subjective hiring criteria.[15]

**8.** Executive Order 11,246, regulating employment practices of employers with government contracts, also requires empirical validation for "selection techniques other than tests," including unscored interviews, unscored application forms, and records of educational and work history, if such techniques have the effect of discriminating against blacks. 41 C.F.R. § 60–313 (1973).

**9.** Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Court there observed that "History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees." *Id.* at 433, 91 S.Ct. at 854. *See also* Carter v. Gallagher, 452 F.2d 315, 326 (8th Cir. 1971), modified on rehearing en banc, 452 F.2d 327 (8th Cir.), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1141–1145 (1971).

**10.** Carter v. Gallagher, *supra,* 452 F.2d at 326; Gregory v. Litton Systems, Inc., 316 F.Supp. 401, 403 (C.D.Cal.1970), modified, 472 F.2d 631 (9th Cir. 1972). *See also* Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1151–1152 (1971). *Compare*

## B. Neutral Practices Perpetuating Vestiges of Discrimination.

The Supreme Court has announced that a district court has:

not merely the power but the duty to render a decree which will so far as possible eliminate the *discriminatory effects of the past* as well as bar like discrimination in the future.

Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) (emphasis added). As applied to employment discrimination cases, the concept which originated in Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 516 (E.D.Va.1968) that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act, was adopted by the Supreme Court in Griggs v. Duke Power Co., *supra,* 401 U.S. at 430, 91 S.Ct. at 853:

Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be

Schware v. Board of Bar Examiners, 353 U.S. 232, 241, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957).

**11.** Wallace v. Debron Corp., 494 F.2d 674, passim (8th Cir. 1974); Johnson v. Pike Corp. of America, 332 F.Supp. 490, passim (C.D.Cal. 1971).

**12.** Rowe v. General Motors Corp., 457 F.2d 348, 358–359 (5th Cir. 1972); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 427 (8th Cir. 1970); Asbestos Workers Local 53 v. Vogler, 407 F.2d 1047, 1054 (5th Cir. 1969).

**13.** United States v. Sheet Metal Workers Local 36, 416 F.2d 123, 136 (8th Cir. 1969); Chance v. Board of Examiners, 330 F.Supp. 203, 223 (S.D.N.Y.1971), aff'd, 458 F.2d 1167 (2nd Cir. 1972).

**14.** United States v. N. L. Industries, 479 F.2d 354, 368 (8th Cir. 1973); Leisner v. New York Telephone Co., 358 F.Supp. 359, 369 (S.D.N.Y. 1973). *See also* EEOC Dec. No. 7094 (Aug. 19, 1969), 2 FEP Cases 192, 193 (1971).

**15.** Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1382–1383 (4th Cir. 1972); United States v. Bethlehem Steel Corp., 446 F.2d 652, 655 (2d Cir. 1971). *See also* EEOC Dec. No. 72–0265 (Aug. 6, 1971), 4 FEP Cases 68 (1972).

maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.

Pre-Act discriminatory conduct is thus an integral component in the calculus of employment discrimination and remedial relief. United States v. N. L. Industries, *supra,* 479 F.2d at 360–361 (and cases therein cited). Neutral policies which perpetuate past discrimination cannot be continued unless there is a showing of "compelling business necessity." United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 308, (8th Cir. 1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 900, 34 L.Ed.2d 687 (1973). *See also* Griggs v. Duke Power Co., *supra,* 401 U.S. at 431, 91 S.Ct. 849; United States v. N. L. Industries, *supra,* 479 F.2d at 364–365. Such a business necessity " 'connotes an irresistible demand.' " The system in question must not only *foster* safety and efficiency, but must be *essential* to that goal." United States v. St. Louis-San Francisco Ry., *supra,* 464 F.2d at 308. In United States v. N. L. Industries, *supra,* 479 F.2d at 365, we stated:

> [T]he business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. (Citation omitted.)

■■■■■ Thus where the prescribed qualifications rest on factors, the ability to obtain which was denied minority applicants under past discriminatory poli-

cies, then the criteria must be modified, to the extent possible, so as to substitute functionally equivalent criteria which does not have a discriminatory effect. Only when there are "available no acceptable alternative policies or practices which would . . . accomplish [the business purpose advanced] equally well with a lesser differential racial impact," might a neutral policy perpetuating prior discrimination be retained. United States v. N. L. Industries, *supra,* 479 F.2d at 365.

## III. MAINTENANCE CRAFT JOBS.

■■■■ The two issues raised on appeal relating to I.P.'s employee selection practices for skilled craft jobs, are governed by different theories under Title VII. The first challenge, I.P.'s use of a battery of standardized tests [16] as selection devices for maintenance craft jobs,[17] rests upon the determination of whether these tests constitute subtle examples of present discrimination. The second issue, temporary enlargement of the minority entry level age limitation for the skilled crafts, is governed by considerations of whether such relief is necessary to dispel the effects of past discrimination and render whole the former discriminatees. Thus we treat these issues separately, but we do not intimate that test validation and entry-level age adjustments may be exclusive remedies for skilled crafts applicants. Our considerations on appeal do not diminish I.P.'s obligation to undertake positive measures to dispel the residual effects of admitted prior discrimination under Title VII, 29 C.F.R. § 1607.14, or under the Executive Order [18] program, 41 C.F.R.

---

**16.** Wonderlic, Bennett, and Minnesota Paper Form tests. These tests have been the subject of repeated challenges under Title VII. *See* Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) [Wonderlic and Bennett]; Duhon v. Goodyear Tire & Rubber Co., 494 F.2d 817 (5th Cir. 1974) [Wonderlic and Bennett]; United States v. Georgia Power Co., 474 F.2d 906, 911 n. 3, 912 n. 5 (5th Cir. 1973) [Bennett and Wonderlic]; Moody v. Albemarle Paper Co., 474 F.2d 134, 138 (4th Cir. 1973) [Wonderlic].

**17.** The Wonderlic and Bennett tests are also employed as selection criteria for production positions. Lower cutoff scores, however, are applied and on this record the tests thus applied have not been shown to have an exclusionary impact on minority applicants for production positions.

**18.** Under Executive Order 11,246 the Office of Federal Contract Compliance (OFCC) monitors Government contractors and subcontractors. The Executive Order requires that no government contractor or subcontractor shall

§ 60–3.14. *See generally*, Note, Remedial Minority Employment, 56 Minn.L.Rev. 842, 844–845 (1972). The determination of the perimeters of affirmative relief, however, is committed to the district court on remand in the exercise of its inherent "equitable power to remedy past wrongs" "once a right and a violation have been shown." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

▇▇▇▇ In analyzing the legitimacy of testing devices as prerequisite to employment, several principles are significant. In Griggs v. Duke Power Co., *supra*, 401 U.S. at 431, 91 S.Ct. at 853, the Supreme Court held that employment practices which "[operate] to exclude Negroes [and] cannot be shown to be related to job performance" were "artificial, arbitrary, and unnecessary barriers to employment" and therefore were prohibited. The Court also held that "Congress has placed on the employer the burden of showing that any given requirement [has] a manifest relationship to the employment in question," *id.* at 432, 91 S.Ct. at 854, and that the EEOC guidelines on Employer Selection Procedures, 29 C.F.R. § 1607, expressed the will of Congress and were thus a measure relevant to demonstrating manifest relationship to employment. *Griggs, supra*, at 434, 91 S.Ct. 10. That burden, however, does not shift to the employer until the plaintiff has shown a discriminatory effect of the challenged employment requirement. *Id.* at 431, 91 S.Ct. 10; Gilmore v. Kansas City Terminal Ry., *supra*, 509 F.2d at 52–53; United States v. Georgia Power Co., 474 F.2d 906, 912 (5th Cir. 1973); Moody v. Albemarle Paper Co., 474 F.2d 134, 138 (4th Cir. 1973); Chance v. Board of Examiners, 458 F.2d 1167, 1176 (2d Cir. 1972). Yet such a showing of discriminatory impact may be

prima facie established by statistical data. Gilmore v. Kansas City Terminal Ry., *supra*, 509 F.2d at 52 (cases therein cited).

The district court here concluded that the evidence was "insufficient to show any substantial impact of the Company's testing program as to the ability of blacks to obtain employment at the defendant's Pine Bluff mill." However the evidence relating to racial success on the tests was meager. I.P. either did not maintain such records or withheld them for they were not available upon plaintiffs' discovery requests nor inquiries at trial. The court apparently relied upon the statistic urged by I.P. that 2 of the 5 incumbent black applicants for transfer to maintenance craft positions were accepted, while only 7 of 59 white applicants were selected. Thus black opportunity for transfer was 40% while white opportunity was only about 11.9%. These figures are somewhat elusive, however. First, the statistical population itself, incumbent employees seeking transfer, represents a discriminatorily conceived pool and does not reflect a typical composition of applicants for maintenance craft positions at Pine Bluff based upon geographical minority population. Second, the two blacks who successfully transferred did so after I.P.'s 1968 commitment to provide affirmative promotional and transfer relief for incumbent former discriminatees. Finally, evidence of a test's discriminatory effect is not confined to the ultimate hiring and rejection ratios. "The use of any [unvalidated] test which adversely affects hiring, promotion, transfer or any other *employment* . . . *opportunity* of classes protected by title VII constitutes discrimination". 29 C.F.R. § 1607.3. *See, e.g.,* Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1372 (5th Cir. 1974); United States v. Georgia Power Co., *supra*, 474 F.2d at 912 n. 5;

discriminate against employees or applicants for employment because of race, color, religion, sex or national origin. Additionally the contractor is required to take affirmative action, *see* 41 C.F.R. § 60–2, to guarantee that members of an affected class who, by virtue

of past discrimination, continue to suffer the present effects of that discrimination, are employed and that such employees are treated during employment without regard to race, color, religion, sex or national origin.

Chance v. Board of Examiners, *supra*, 458 F.2d at 1176.

Better evidence of the test's racial impact can be found in the testimony of the personnel director at Pine Bluff who was aware of no black success [19] in 1962 on the Wonderlic and Bennett tests for production transfer eligibility. This was confirmed by one of the Pine Bluff black employees. Similarly he did not believe that any blacks passed the production battery of tests in 1967 or 1968. There is, however, some conflicting evidence on this latter point for one of plaintiffs' witnesses testified that two blacks passed in 1968. The fact remains, however, that as late as 1971, only two blacks had been hired into the apprentice program at Pine Bluff. Black employees were virtually excluded even from production transfer until 1968 and passing scores for production transfer were even lower than minimal scores for skilled craft admittance. And company officials, notably the Industrial Relations Manager at Pine Bluff, were aware of and expressed disappointment over the poor minority success on the test batteries.

This statistical evidence, then, though partly based on tests administered to production employees, is sufficient to show the racially disparate impact of the skilled crafts' testing program, *see also* Boston Chapter, NAACP,

Inc. v. Director and Commissioner of Civil Service, 504 F.2d 1017 at 1019 (1st Cir. 1974), and to shift the onus of validation to I.P., which appropriately came forward with evidence of attempted validation the district court determined to be adequate. The legal issue, then, on review in this case resolves to the sufficiency of the validation study as persuasive evidence that the test battery is truly predictive of job performance. For this we turn to the EEOC guidelines.

Under the guidelines, "[e]vidence of a test's validity should consist of empirical data demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." 29 C.F.R. § 1607.4(c). Three procedures are cited as the generally acceptable methodolgy for satisfying those requirements: criterion-related validity, content validity, and construct validity.[20] The latter two are permissible only where criterion-related validity is not feasible. 29 .C.F.R. § 1607.5(a). Here I.P. undertook a predictive criterion-related validity study for higher than entry level jobs, a permissible undertaking for a validity study under 29 C.F.R. § 1607.4(c)(1). Supervisor raters were asked to rate workers in the sample under a paired comparison rating technique.[21] The rating lists were then

19. Applicants for transfer to other production lines of progression were originally similarly required to pass the same Wonderlic and Bennett tests required of maintenance employee applicants. Cutoff scores, however, were set lower than minimal passing scores for transfer to skilled crafts jobs. These scores for production transfer were themselves lowered in later years.

20. Criterion validity correlates test scores with some measure of job success. It can be accomplished by two methods: predictive validation or concurrent validation, " 'Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired'; 'Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job.' " Vulcan Society of New York City Fire Dept. v. Civil Service Comm. of N.

Y., 490 F.2d 387, 394 (2d Cir. 1973). Content validity correlates the content of the test with the content of the job and is generally used to determine the validity of achievement tests. Construct validity matches an employment test with results of some other test known to measure the relevant characteristics.

21. This technique was explained by I.P.'s Industrial Psychologist as:

"[Y]ou make up a little slip, put each pair of guys in the group to be rated, so everybody is paired with everybody else. And the rater then goes through that little booklet and he checks each pair. He checks the one man of those two doing the better job on his job . . .. So when he gets through, every man has been paired with every other man. Then you tally those, and the guy that gets the most tallies is 'superior' . . . and the guy that gets the fewest tallies is . . . bottom."

matched with test battery results to determine whether those tests had been an adequate measure of job performance. We note several deficiencies in this validation study.

■ *Sample deficiencies and lack of differential validation.* The samples were small and they included no minority skilled craft employees. Neither was there a differential validation study performed. Under 29 C.F.R. § 1607.5(b)(1), "[w]here a validity study is conducted in which tests are administered to present employees, the sample must be representative of the minority groups currently included in the applicant population." Under 29 C.F.R. § 1607.5(b)(5), data must be generated and results separately reported for minority and nonminority groups wherever technically feasible.

Here, however, I.P.'s Pine Bluff Industrial Relations Manager, his assistant, and the expert psychologist called by I.P. all represented in their testimony that no attempts were made to conduct a differential validation, to include blacks in the validation studies, or even to maintain records of black performance on the standardized tests. Under the guidelines, the burden of establishing that noncompliance with any of the minimal validation standards is not technically feasible is on the employer. 29 C.F.R. § 1607.4(b). It would seem that black performance on the tests could easily have been calibrated by I.P. since the tests have been administered to blacks since 1962 for both production and maintenance applicants. Similarly, balance in the racial composition of the samples could seemingly have been achieved, as well as differential validation, by selecting validation samples from other I.P. mills or even other companies within the industry where similar tests were employed and minority representation was adequate. Such statistics are permissible under the guidelines where (a) the studies pertain to jobs which are comparable, and (b) there are no major differences in contextual variables or sample composition which are likely to significantly affect validity. 29 C.F.R. § 1607.7.

I.P.'s casual disregard of the obligation to undertake differential comparisons on test results and in validation studies falls short of proof of technical nonfeasibility. The absence of differential validation and the deficiencies in the sample composition, therefore, render the study inadequate. *See also* United States v. Georgia Power Co., *supra*, 474 F.2d at 914–915, 916; United States v. Jacksonville Terminal Co., 451 F.2d 418, 456 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972).

*Job Analysis.* 29 C.F.R. § 1607.5(b)(3) establishes as one of the critical standards for validation that:

> The work behaviors or other criteria of employee adequacy which the test is intended to predict or identify must be fully described . . . . Whatever criteria are used they must represent major or critical work behaviors as revealed by careful job analysis.

Here there were no adequate job analyses performed. Raters were given general guidelines then directed to select the better of two employees in various pairs. The guidelines apprised the raters to consider factors such as quality of work on the job, quantity of work on the job, ability to work with others, ability to direct a crew if that were required of a job, job knowledge and safety awareness. There were, however, no individualized analyses for each of the different jobs under consideration. Although somewhat constrained, the rating process here was still principally subjective. We have in the past condemned the use of such nebulous standards. United States v. N. L. Industries, *supra*, 479 F.2d at 368; United States v. Sheet Metal Workers Local 36, *supra*, 416 F.2d at 137–138. Where, as here, subjective evaluations are used in the very process of test validation, a similar potential for abuse exists. Moreover, job analyses are intended to be a careful quantification of criteria that "represent major or critical work behaviors" for the individual jobs. 29 C.F.R. § 1607.5(b)(3). "A job analysis for one [job] . . . would not necessarily be suitable for another." Walston

v. County School Board of Nansemond County, 492 F.2d 919, 926 (4th Cir. 1974). There is no indication that these general guidelines here were individualized for the wide variety of jobs examined. The resulting absence of proper and careful job analyses, therefore, is fatal to the validation study. *See* Moody v. Albemarle Paper Co., *supra*, 474 F.2d at 139; Western Addition Community Organization v. Alioto, 340 F.Supp. 1351, 1355 (N.D.Cal.1972).

■ *Utility of the test.* Several infirmities arise here. First, each of the battery tests was not validated for each job for which the test is a prerequisite of employment.[22] This offends 29 C.F.R. § 1607.4(c) because a failing score on any one of the three tests disqualifies an applicant from employment in a skilled craft position at Pine Bluff. Since each test then effectively exercises an absolute veto prerogative, each must be validated to show significant correlation with respective job performance. *See* Moody v. Albemarle Paper Co., *supra*, 474 F.2d at 138, 140. Additionally we note that for 9% of the cases considered there was no correlation between the test scores and job performance. If a test does not prove statistically significant for a given job, it cannot be employed as a selection criterion. 29 C.F.R. § 1607.5(c)(1). *See also* United States v. Georgia Power Co., *supra*, 474 F.2d at 915. Under *Griggs*, the test battery is prohibited for at least those 9% cases where the test bears no demonstrable relationship to the employment in question. Griggs v. Duke Power Co., *supra*, 401 U.S. at 431, 91 S.Ct. 849. Finally the evidence strongly suggests that the cutoff scores[23] have been set too high. For example 40% of the skilled craftsmen in a sample of machinists and mill-wright journeymen would have been unable to achieve admission to their respective crafts under the present standards. Some justification must be proffered for the level of cutoff adopted under these circumstances. *See* Walston v. County School Board of Nansemond County, *supra*, 492 F.2d at 927.

Thus we conclude that on remand the trial court should direct I.P. to conduct new validation studies conforming to the standards set forth herein and take such additional evidence as is necessary to permit the trial court to determine whether or not the administration of the tests has in fact resulted in a racially discriminatory hiring or transfer policy. If the trial court determines that the tests have had such result, it should then devise a remedy which will: (a) determine which tests are permissible under the standards set forth herein and the proper cut-off score for each test; (b) direct that prior applicants who have taken the tests and whose scores meet the revised standards be offered employment in maintenance craft jobs on a preferred basis as vacancies become available with the same seniority which would have resulted if they had been employed in maintenance craft jobs as of the time of their first application, and (c) offer all other members of the affected class an opportunity to take the tests under the revised standards and give hiring or transfer preference to those who pass the tests under the revised standards.

■ The second question on appeal concerning relief for minority maintenance crafts' applicants[24] is the request for temporary enlargement of the entry level age limitation. By reason of past discrimination,[25] because there was no showing of business necessity[26] for the

---

22. Wonderlic correlations were reported for six skilled craft groupings; Bennett correlations, for nine groupings; and Minnesota Paper Form correlations for only one grouping. By contrast, there are thirty skilled craft jobs at Pine Bluff.

23. The cutoff scores on the test battery for skilled crafts jobs at Pine Bluff are: Wonderlic, 18; Bennett, 45; Minnesota Paper Form, 45.

24. We leave for determination of the trial court the request that the apprenticeship program be shortened in the case of minority applicants.

25. Carter v. Gallagher, *supra*, 452 F.2d at 326.

26. United States v. N. L. Industries, *supra*, 479 F.2d at 364; United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 308 (8th Cir.

present age limitation, and because I.P. presently permits incumbent production workers who have been bumped down to entry level positions in their departments to enter the apprenticeship programs up to the age of 36, the entry level age for admission to the skilled crafts apprenticeship programs should be enlarged to age 36 as to all members of the affected class, until the district court determines that there is sufficient minority representation in I.P.'s maintenance craft jobs. See Carter v. Gallagher, 452 F.2d 315, 326 (8th Cir. 1971), modified on rehearing en banc, 452 F.2d 327 (8th Cir.), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1973). The details of this remedy are left to the district court on remand.

## IV. PRODUCTION JOBS.

From the commencement of operations at the Pine Bluff Mill until 1962, employees were assigned to production jobs on the basis of race. However, pursuant to Executive Order 10,925,[27] I.P. announced a policy of racial desegregation for both the physical facilities at the mill and admission into lines of progression. Initial company focus was directed towards desegregation of the physical facilities and only one black was permanently assigned to a white job prior to 1967.[28]

In 1968, the Office of Federal Contract Compliance, in the execution of the Ex-ecutive Order program, advised I.P. that they had failed to comply with the non-discrimination requirements of the Executive Order and that, in order to retain government contract privileges, they would have to change employment practices. A conference with representatives of the Southern Kraft Division of I.P. was thereupon called by OFCC in Jackson, Mississippi, to discuss necessary modifications for Executive Order compliance. A Memorandum of Understanding, negotiated at that meeting and endorsed by the affected unions and representative mills, was approved by the OFCC as sufficient for compliance with the Executive Order. That memorandum, dealing only with production jobs, created remedial transfer, promotion and recall opportunities for members of an "affected class," defined as all black incumbent employees hired before September 1, 1962, and those additional blacks hired into black jobs after 1962.[29] The memorandum provided that members of the affected class could compete against other applicants[30] for entry level positions in any other line of progression on the basis of mill seniority, so long as an affected class member's qualifications were as high as the minimally qualified employee currently working in the line.[31] Affected class members who transferred under these provisions were offered wage maintenance protection so as not to deter the exercise of the transfer rights to lower paying entry level jobs in other lines of progression.[32] The memo-

1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 900, 34 L.Ed.2d 687 (1973).

27. Executive Order 10,925 has been superseded by Executive Order 11,246.

28. This was due in large part to the fact that in 1962 I.P. began to require black applicants for employment and transfer to pass tests previously given only to whites. Minimal passing scores for production jobs were set at 18 and 38 on the Wonderlic and Bennett tests respectively. In 1968 the testing requirements for production jobs were reassessed and thereupon reduced to 15 and 20 respectively. Significantly greater numbers of black applicants have since been hired for production jobs. The present testing requirements for production employment do not now appear to have an adverse racial impact.

29. At the time of trial, that class consisted of 57 employees.

30. Usually such applicants came from the labor pools associated with a specific department and therefore competed on the basis of department seniority, a less general form of contract seniority.

31. The effect of this proviso was to eliminate the test battery requirement for affected class transferees to other production LOP's.

32. Any affected class member requesting transfer within six months could have his former permanent wage rate "red circled," the effect of which was to retain that rate after transfer in those cases where the transferee position was rated at a lower wage than his former laborer wage. The maximum "red circle" rate was $3.00 per hour. Most, but

randum also established that promotion, demotion, layoff, and recall rights of affected class members would be governed by mill seniority whenever a class member was in competition with a nonclass member. Finally the memorandum provided that negotiations were to take place at the mill level, between local management and local unions regarding possible merger or shortening of lines of progression, job skipping, and advanced level entry.[33]

In May, 1969, upon I.P.'s request, OFCC issued a clarification of the Jackson Memorandum's provisions relating to promotion and recall. As I.P. had been administering the Memorandum, affected class employees either permanently *or temporarily*[34] classified on the job immediately preceding the vacancy, could be considered to fill the permanent vacancy and could compete with nonaffected class members on the basis of mill seniority. The Union had opposed this practice, since under the collective bargaining agreement only those permanently assigned to immediately preceding jobs were eligible for permanent promotions, and also had contended that affected class members could not compete on the basis of mill seniority against those eligible for recall to an entry level

position in a line of progression. The OFCC response, called the McCreedy Letter, authorized the company to either establish residency requirements for each job representing minimal time periods essential to qualification for advancement, or to limit competition for permanent vacancies to those permanently assigned to the immediately preceding job classifications. I.P. chose the latter course. The McCreedy Letter also eliminated affected class mill seniority competition against incumbent employees with recall rights for entry into a line of progression.

After the trial of this matter below, a revision of the Jackson Memorandum was tentatively adopted. The 1972 Jackson Memorandum expanded the parameters of the affected class; advanced the maximum red circle wage maintenance rates from $3.00 to $3.86 per hour; permitted permanent promotion eligibility to rest upon fulfillment of residency requirements in prerequisite jobs without regard to the permanent or temporary nature of assignment thereto; and permitted affected class competition on the basis of mill seniority against incumbents with recall rights for entry level positions in lines of progression. The memorandum again called for local nego-

not all, affected class members earned less than this amount.

**33.** As a result of Pine Bluff local negotiations, two jobs were added to the top of the Wood Yard line of progression (the formerly all black line of progression) and one formerly black miscellaneous job was incorporated into each of the Pulp Mill and Beater Room lines of progression. No lines of progression were shortened. Job skipping and advanced level entry were apparently not discussed.

**34.** When a temporary vacancy occurs somewhere in a line of progression, for example as a result of vacation, medical, or military leave, temporary assignments, called temporary set-ups, are made to fill the vacancy. These assignments are determined on the basis of job, then department, seniority. Thus when a vacancy occurs in the middle of a line of progression, under the bidding and seniority provisions operative, the person in the position immediately below the vacancy is generally assigned to fill the temporary va-

cancy, thereby creating another temporary vacancy. The net effect of this process is that several persons in the line of progression temporarily advance up the line and create a temporary vacancy in the entry level position at the bottom of the line. The longer the individual line of progression, the greater the chance for temporary set-ups. Oftentimes, then, employees temporarily progress more than one position in the line and, having either been set-up at, immediately below, and even above, a particular vacancy are qualified to perform the skills required of a position more than one place above them in the line of progression. The effect of permitting competition only among permanent assignees to the immediately subordinate job, then, is to effectively eliminate competition for permanent vacancies; whereas, if a qualified temporary present or former assignee may compete for permanent vacancies up the line, some degree of job skipping is the result, and the pre-existing seniority pattern is not locked in.

tiations on advanced level entry and job skipping.[35]

The district court found.that, with respect to production jobs, since much discrimination had been eliminated, further injunctive relief from the allegedly discriminatory seniority, promotion, and transfer policies governing those jobs was inappropriate. The legal issue on appeal, then, is whether I.P.'s allegedly neutral policies, as modified by the Jackson Memoranda, effectively dispel the present effects of admitted past discrimination or, if not, whether they are necessary to a compelling business necessity.[36] See pp. 1346–1347, ante.

Under Title VII, seniority and promotion policies have been frequently scrutinized by courts, despite an exemption for "bona fide seniority or merit system[s]," 42 U.S.C. § 2000e–2(h), for they can be

subtle forms of discrimination which perpetuate discriminatory patterns of the past. See, e. g., Pettway v. American Cast Iron Pipe Co., supra, 494 F.2d at 224; Johnson v. Goodyear Tire & Rubber Co., supra, 491 F.2d at 1373 n. 27 (and cases therein cited); United States v. St. Louis-San Francisco Ry., supra, 464 F.2d at 307. The approach most often followed in ameliorating the built-in discrimination peculiar to dual seniority plans, the most common form of seniority discrimination, is the "rightful place" doctrine.[37] Bing v. Roadway Express, Inc., 485 F.2d 441, 451 (5th Cir. 1973); United States v. St. Louis-San Francisco Ry., supra, 464 F.2d at 309; United States v. Bethlehem Steel Corp., 446 F.2d 652, 661 (2nd Cir. 1971). Various remedies in effectuating the rightful place doctrine have been adopted. Among them are mergers of segregated unions,[38] advanced level transfers,[39] job

---

**35.** The record does not disclose whether those negotiations took place. Under the 1968 Jackson Memorandum, however, I.P. took the position that the implementation of wage retention and mill seniority competition practices upon transfer obviated the need for job skipping and advanced level entry. But see n. 34, supra.

**36.** Our inquiry does not end with the implementation of the Jackson Memoranda, although they have been approved by the OFCC as sufficient for compliance with the nondiscrimination standards of the Executive Order program. "[F]inal responsibility for enforcement of Title VII is vested with federal courts." Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1018, 39 L.Ed.2d 147 (1974). See also Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 219, 221 n. 21 (5th Cir. 1974); Reed v. Arlington Hotel Co., Inc., 476 F.2d 721, 724 (8th Cir.), cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 985 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). Nor does I.P.'s reliance on the provisions of the memoranda, if they prove short of adequate remedy under Title VII, excuse I.P. from compliance with Title VII. "[G]ood intent or absence of discriminatory intent does not redeem employment procedures . . . that operate as 'built-in headwinds' for minority groups . . . ." Griggs v.

Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. at 854.

**37.** The "rightful place" approach holds that continued maintenance of the relative competitive disadvantage imposed on minorities by the past operation of a discriminatory system violates Title VII. Thus it permits minority members to compete for promotion on the basis of total company service. Note, Title VII, Seniority Discrimination and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1268–1275 (1967). See also Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1155–1164 (1971); Cooper and Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1626–1629 (1969).

**38.** Rock v. Norfolk and Western Ry., 473 F.2d 1344, 1348 (4th Cir.), cert. denied, 412 U.S. 933, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973); United States v. St. Louis-San Francisco Ry., supra, 464 F.2d at 310–311.

**39.** United States v. Hayes International Corp., 456 F.2d 112,.119 (5th Cir. 1972); Long v. Georgia Kraft Co., 450 F.2d 557, 561 (5th Cir. 1971); United States v. Local 189, United Papermakers & Paperworkers, 301 F.Supp. 906, 917–918 (E.D.La.), aff'd, 416 F.2d 980, 990 (5th Cir. 1969); Bush v. Lone Star Steel, 373 F.Supp. 526, 539–540 (E.D.Tex.1974).

skipping,[40] and wage maintenance.[41] To some degree these policies are reflected in the Jackson Memoranda. However, those compliance pronouncements are deficient in several respects.

The $3.00 per hr. ceiling on wage rate protection under the 1968 Jackson Memorandum discouraged several affected class members who already had permanent wage rates in excess of that figure. The increased red circle ceiling in the 1972 memorandum, it has been represented, reflects merely overall increases in wage rates since 1968 but does not bring within its protections those previously excluded. Additionally, temporary assignments to jobs higher up a line of progression with comparably higher rates of pay are a frequent fact of employment at Pine Bluff. Thus an employee's permanent wage rate does not necessarily represent his average hourly net rate of pay over a period of time. Finally, the red circle computation does not permit cost-of-living and contract renegotiation wage increase adjustments. *See generally* n. 41, *ante.*

The necessity to serve in every job in a line of progression is still an announced policy of I.P. As proffered at oral argument, an employee must still meet a residency requirement on the job for which he is bidding as well as that of the job immediately below. The cumulative effect of this policy is to nearly eliminate the possibility of job skipping or advanced level entry transfer opportunities. These seemingly neutral requirements that an employee serve in every job in a line of progression have impeded, in the past, affected class members' progress toward their rightful place. They may be retained, therefore, only upon a showing of business necessity. United States v. N. L. Industries, *supra*, 479 F.2d at 364–366; United States v. St. Louis-San Francisco Ry., *supra*, 464 F.2d at 308–309. I.P., however, did not present evidence that each job was an essential prerequisite to the next higher job in every line of progression. Some general evidence only was presented about general structures of lines of progression and their business convenience. But that evidence was not specific enough to meet the test of business necessity. Additionally, neither is there any assessment of the legitimacy of the length of each individual residency period [42] or consideration of whether functionally equivalent experience in another line of progression may be substituted for the residency period. *See* United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 453–454. Absent a showing of business necessity for, and justification of, the residency requirements and their respective lengths, advanced level entry and job skipping may be appropriate remedies. *See* n. 39 and n. 40, *ante.*

Finally, even assuming the trial court should determine that each job is essential to progression, I.P. has in the past, though in part in reliance on OFCC, retarded affected class promotion by its administration of the announced policies. After the McCreedy Letter, competition for permanent vacancies was limited to only those permanently assigned to the position immediately subordinate to the vacancy. This policy effectively eliminated competition for permanent vacancies, and was totally ineffectual in rendering whole the former discriminatees. The 1972 memorandum permits promotion eligibility to rest upon fulfillment of residency requirements without regard to

---

40. *Id.*

41. United States v. Bethlehem Steel Corp., 446 F.2d 652, 660–661 (2d Cir. 1971) citing Robinson v. Lorillard Corp., 319 F.Supp. 835, 839, 843 (M.D.N.C.1970); Bush v. Lone Star Steel, *supra,* 373 F.Supp. at 539–540; Hicks v. Crown Zellerbach Corp., 321 F.Supp. 1241, 1243–1244 (E.D.La.1969); United States v. Local 189, United Papermakers & Paperworkers, *supra*, 301 F.Supp. at 918, 923.

42. At oral argument, I.P. represented that the average residency requirement for higher level jobs was two months and less than that for lower level jobs. It is true that this policy was adopted after the trial in the court below. However, the district court relied on this modification in denying future injunctive relief.

permanent assignments to jobs. However, to bid on a vacancy, an employee must have fulfilled both the residency period for the job immediately subordinate to the vacancy, as well as the period for the vacancy itself. The latter requirement, while properly left to the district court for determination, should be very closely scrutinized. Another factor that will retard affected class movement and is a result of I.P.'s administration of the 1972 Jackson Memorandum is its present practice of further restricting competition for those vacancies to those either permanently assigned, or *then* temporarily assigned, to an immediately subordinate job. Employees may have satisfied a legitimate residency period in the recent past and thus be qualified for promotion though not be temporarily assigned to ·the preceding job when the permanent vacancy occurs in the line.

▮ For these reasons we conclude that the present transfer, promotion, and seniority practices in the production department at Pine Bluff continue to perpetuate the effects of past discrimination. No significant movement to rightful places has been realized by former discriminatees, although some movement has been accomplished.[43] Thus some relief is warranted, and the district court was in error in denying such relief. We applaud, however, the district court's management of these complex issues as well as I.P.'s attempt to advance its discriminatees into and up other lines of progression in the production departments. We recognize that although I.P. was initially culpable, it was not individually so. The respective, then-segregated, unions must share liability for the discriminatory past conduct. Indeed,

even since 1968, affected class movement has been partially frustrated by positions ωdopted by the unions, although at least UPIU has recently expressed a willingness to effectuate whatever remedies the court should impose.[44]

On remand the court should insure full wage protection to affected class members who exercise transfer opportunities by: extending red circle ceilings to average hourly rates, inclusive of temporary set-ups, over a reasonable period of time immediately preceding the transfer, or to permanent wage rates of the employee, whichever is higher, including therein a factor for future adjustments for cost-of-living or contract renegotiation wage increases and by extending coverage to every member of the affected class. Such provisions should be accompanied with an order for full publication, dissemination, and explanation of the terms of the court's decree. Additionally, red circle protections should extend to affected class members who transfer to maintenance craft positions. The district court should require that I.P. demonstrate which jobs provide essential training for progression and are supported by business necessity and which jobs, if any, could be skipped upon entry and promotion. The court should also review the lengths of the residency requirements to determine whether they are the least restrictive means to accomplish their purpose and consider whether functionally equivalent experience in former lines of progression may satisfy ·those requirements. Finally, the court should review I.P.'s administration of its policy of advancement of affected class members to their rightful place in light

---

**43.** Judged in light of the rightful place doctrine I.P. adopts with respect to returning military employees, affected class promotion is anything but salutary. Under the former policy, a returning military incumbent employee is entitled to any promotion which he would have received had he been there as determined by his place on the seniority list. He would, however, return to the job he left, but he would then move up through the intermediate jobs *as fast as he could be trained* without regard to intermediate vacancies.

**44.** In the second week of trial, United Paperworkers International Union, Locals 731, 735, 833 and 898, stipulated with plaintiffs as to its discriminatory past and willingness to seek affirmative redress for discriminatees and thereafter took a nonadverse position as party defendant. International Brotherhood of Electrical Workers, Local 2033, however, remained an active party defendant.

of I.P.'s military rightful place policy, with a view toward rendering whole these former discriminatees as expeditiously as possible and to the same extent that it now accords a rightful place to returning service men. Provisions of this relief should be made available to all affected class members regardless of whether they have declined transfer offers in the past. If these conditions are fully implemented, the need for a back pay award will be obviated.

## V. ATTORNEYS FEES.

The district court here awarded plaintiffs attorneys fees in the amount of $15,000 for their presentation of this Title VII case. The award of attorneys fees under these circumstances is a matter committed to the discretion of the district court. This matter is remanded, however, with directions that the district court allocate the assessment of the attorneys fees among the three defendants weighing culpability, size, and ability to pay. This remand is also without prejudice to whatever further award of attorneys fees the district court determines to be in the interest of justice as a result of further proceedings.

We award the plaintiffs $3,000 attorneys fees on this appeal and assess them as follows: $2,000 to be paid by I.P., and $500 each by the two union defendants.

For the reasons hereinbefore expressed, the order of the district court is reversed in part, vacated in part and remanded for further proceedings consistent with the views expressed herein.

## ON PETITION FOR REHEARING

Upon consideration of the Petition for Rehearing filed by International Paper Company (IPC), the Court has determined that certain minor modifications should be made in its opinion.

IPC claims that portions of the Court's opinion incorrectly state the facts because of a misinterpretation of remarks of counsel for IPC at oral argument. The portions of the opinion claimed to be in error are as follows:

1. p. 1355. The necessity to serve in every job in a line of progression is still an announced policy of I.P. As proffered at oral argument, an employee must still meet a residency requirement on the job for which he is bidding as well as that of the job immediately below. The cumulative effect of this policy is to nearly eliminate the possibility of job skipping or advanced level entry transfer opportunities.

2. p. 1356. However, to bid on a vacancy, an employee must have fulfilled both the residency period for the job immediately subordinate to the vacancy, as well as the period for the vacancy itself. The latter requirement, while properly left to the district court for determination, should be very closely scrutinized.

3. p. 1356. Another factor that will retard affected class movement and is a result of I.P.'s administration of the 1972 Jackson Memorandum is its present practice of further restricting competition for those vacancies to those either permanently assigned, or *then* temporarily assigned, to an immediately subordinate job.

After a careful review of the transcript of oral argument the Court has concluded that the suggestions are well taken and that the opinion should be and is hereby modified by inserting the following material in place of the material set forth in paragraphs 1 and 2, and deleting all of the material in paragraph 3.

1. p. 1355. The necessity to serve in every job in a line of progression, (with a few exceptions), is still an announced policy of I.P. As proffered at oral argument, in most cases an employee must still meet a residency requirement on the job immediately below the job for which he is bidding. The cumulative effect of this policy is to severely restrict the possibility of job skipping or advanced level entry transfer opportunities.

2. p. 1356. However, to bid on a vacancy, an employee must have ful-

filled the residency period for the job immediately subordinate to the vacancy. This requirement, while properly left to the district court for determination, should be very closely scrutinized.

In addition, the final sentence of footnote 35 is deleted.

The petition for rehearing is denied.